In re the APPLIANCE STORE, INC.;
and Northeast Consumer Technology
Stores, Inc., Debtors.

GENERAL ELECTRIC CAPITAL
CORPORATION, Movant,

v.

Joseph P. NIGRO, Trustee For The Appliance Store, Inc. and Northeast Consumer Technology Stores, Inc., Respondent.

Bankruptcy Nos. 92–21573–
BM, 92–21574–BM.
Motion Nos. 94–1164M, 95–
0173M and 95–0215M.

United States Bankruptcy Court,
W.D. Pennsylvania.

April 27, 1995.

Joseph P. Nigro, Chapter 7 Trustee, Nigro & Malley, Pittsburgh, PA.

Joseph Katarincic, Kimberly Kirk, Katarincic & Salmon, Pittsburgh, PA, for Gen. Elec. Capital Corp.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

General Electric Capital Corporation (hereinafter "GECC") asserts that it is an oversecured creditor and seeks allowance pursuant to § 506(b) of the Bankruptcy Code of attorneys' fees and expenses in the amount of $299,960.58. In addition, GECC seeks allowance of a portion of these attorneys' fees in the amount of $160,134.50 as a chapter 11 administrative claim pursuant to §§ 503(b)(4) and 507(a)(1) of the Code.

The chapter 7 trustee apparently does not object to GECC's request for allowance of attorneys' fees in the amount of $229,960.58. He has objected, however, to the request that some of these fees be allowed as chapter 11 administrative claims pursuant to § 503(b).

We note that there are a mountain of hours allegedly utilized and the detail as to same is at best unclear. We wonder how, why, and if the hours were in fact used. However, as no one has raised the issue and as a detailed review will not change the result, we will not at this time resolve the question as to the propriety of same.

The trustee's objection will be sustained. GECC's request for attorneys' fees and expenses in the amount of $299,960.58 will be allowed. Its request for allowance of a chapter 11 administrative claim in the amount of $160,134.50 will be denied.

# I

## FACTS

Debtors The Appliance Store, Inc. (hereinafter "TAS") and Northeast Consumer Technology Stores, Inc. (hereinafter "Northeast") sold major household appliances and consumer electronic goods through their retail stores located in Pennsylvania, Ohio, and West Virginia.

TAS and GECC executed an agreement in March of 1989 wherein GECC provided financing so that TAS could purchase ten (10) specified brand names for resale in its stores. TAS in turn granted GECC a security interest in all products TAS obtained with these funds for resale and in all proceeds derived from the sale of the products.

Debtors filed voluntary chapter 11 petitions on April 7, 1992, and continued operating their businesses pursuant to §§ 1107 and 1108 of the Code. The schedules listed GECC as having a secured claim in excess of $4,750,000.00.

On April 10, 1992, a cash collateral order between debtors and GECC was approved on an interim basis.

Debtors agreed to establish two (2) separate bank accounts. The first account was an interest-bearing account into which debtors were to deposit on a daily basis that portion of total revenues generated from the sale (or other disposition) of products equal to the actual wholesale invoice cost of the products. Accrued interest went to GECC. The second account consisted of the difference between the retail sale price realized from sale of these products and their actual wholesale invoice cost. Debtors' authorized use of cash collateral was restricted to proceeds in the second account. They could utilize funds in the first account only with prior written approval from GECC.

As adequate protection to GECC for allowing debtors to use its cash collateral, debtors granted GECC a security interest in the cash collateral deposited into both accounts, to the extent that the cash collateral constituted proceeds of collateral in which GECC had a perfected security interest as of the date of the filing of the bankruptcy petitions.

Debtors also agreed to make deposits into the two accounts on a daily basis. GECC was authorized to apply the funds deposited into the first account towards reduction of prepetition indebtedness. In addition, debtors granted GECC a replacement lien and security interest superior to all other liens in all products debtors acquired postpetition and in the proceeds thereof. Also, GECC's cash collateral claim was granted superpriority status pursuant to § 364(c)(1) of the Code over all administrative expenses specified in §§ 503(b) and 507(b) of the Code and was equal in status to the cash collateral claim of Whirlpool Financial Corporation, another secured creditor.

On April 15, 1992, an order was entered approving a supplement to the cash collateral order. The supplement provided that GECC could, at its option, lend the funds in the first account back to debtors so they could purchase products from General Electric Corporation. GECC was granted a superpriority claim pursuant to § 364(c)(1) of the Code for any funds so loaned to debtors.

Orders were entered on May 6, 1992, and again on July 21, 1992, approving on an interim basis debtors' use of GECC's cash collateral.

On September 24, 1992, debtors were authorized to obtain postpetition financing from Whirlpool Financial Services Corporation (hereinafter "Whirlpool") and Maytag Financial Services Corporation (hereinafter "Maytag"). Along with GECC, Whirlpool and Maytag were secured creditors who had provided debtors with floor plan financing.

Both bankruptcy cases were converted to chapter 7 proceedings on December 28, 1992, upon debtors' motion. A chapter 7 trustee was appointed that same day.

On December 29, 1992, GECC requested relief from the automatic stay so that it could foreclose against debtors' merchandise and cash proceeds. GECC asserted that debtors had violated various provisions of the cash collateral order. Its request subsequently was granted on January 29, 1993.

GECC subsequently disclosed that it had realized a surplus in the amount of $110,177.65 when it liquidated the collateral subject to its lien. GECC claimed that, as an oversecured creditor, it was entitled to apply $80,732.00 of that amount to its costs in repossessing the inventory and also requested pursuant to § 506(b) of the Code attorneys' fees in the amount of $52,093.78. The trustee subsequently denied that the amounts requested were reasonable and filed an adversary action against GECC at Adversary No. 93–2579–BM to compel it to turn over the surplus to him as trustee.

As movant failed to meet its burden, an order was entered on August 10, 1994, approving GECC's request to apply the surplus realized from liquidation of its collateral to its moving and storage expenses and granting its request for attorneys' fees. The order further provided that GECC did not have to remit any of the surplus realized from liquidation of its collateral.

On December 31, 1992, the trustee submitted an omnibus motion for a consent order regarding administration of the chapter 7 estates. Among other things, a procedure was devised whereby the trustee would handle matters pertaining to consumer layaways and deposits and undelivered products. The trustee would either deliver products to customers who had paid in full for them or would refund all of the money they had prepaid. To facilitate this arrangement, GECC agreed to allow the trustee to utilize funds in an account subject to GECC's lien. The trustee also agreed that GECC could repossess its collateral on condition that it place all funds realized from resale of the collateral into an interest-bearing account pending further order of court. The provisions of the omnibus motion were approved by order or court on December 31, 1992.

A class action was brought on February 26, 1993, at Adversary No. 93–2093–BM, 158 B.R. 384, by two former employees of debtors on behalf of themselves and all others similarly situated. Whirlpool, Maytag, GECC, and the trustee were named as defendants. Monetary and injunctive relief were sought from Whirlpool, Maytag, and GECC. Only injunctive relief was sought from the trustee.

Plaintiffs claimed that they and some one hundred and eighty other employees of debtors had not been paid for work they performed in December of 1992. They further alleged that approximately eight million dollars of products in which Whirlpool, Maytag, and GECC had security interests had been sold during that period.

According to plaintiffs, Whirlpool, Maytag, and GECC had benefitted from the efforts of debtors' employees and were obligated pursuant to 11 U.S.C. § 506(c) to pay the costs of preserving and disposing of their collateral. Included among these costs, plaintiffs alleged, were the unpaid wages and other benefits due and owing to the employees.

Plaintiffs sought a determination that Whirlpool, Maytag, and GECC were jointly and severally liable for all unpaid wages and benefits to which the employees were entitled and an order directing them to pay this amount to the trustee. They also sought an order directing the trustee to remit such amounts as were due and owing to debtors' employees.

In recognition of the fact that the trustee was only a nominal party to the class action suit and had been named only because he was necessary if complete relief was to be accorded to plaintiffs should they prevail

against the other defendants, the trustee was excused on July 15, 1993, from actively participating in the case.

Settlement of the class action suit at Adversary No. 93–2093–BM was reached on January 21, 1994. Whirlpool, Maytag, and GECC agreed to establish a fund in the amount of $210,928.00 from which payment to class members would be made. GECC agreed to contribute $26,928.00 to the fund. Whirlpool and Maytag agreed to contribute the remainder. The trustee had no obligation as a result of the stipulation with the exception of making payment to the plaintiffs. The order of March 21, 1994, approving the settlement provided in pertinent part that GECC was to pay the sum of $26,928.00 to plaintiffs' counsel from funds held by the trustee.

During these cases, GECC was represented by two law firms. Weil, Gotshal & Manges served as its general counsel. Katarincic & Salmon served as its local counsel.

On September 22, 1994, GECC submitted an amended application for approval of attorneys' fees and expenses in the amount of $299,960.58. GECC claimed that, as an oversecured creditor, it was entitled to the following attorneys' fees and expenses:

| | | |
|---|---|---|
| (1) | Cash Collateral Order | $ 46,995.50 |
| (2) | Postpetition Financing Negotiations | 79,640.00 |
| (3) | General Chapter 11 Matters | 30,352.50 |
| (4) | Foreclosure Activities | 14,166.50 |
| (5) | General Chapter 7 Matters | 65,196.15 |
| (6) | Creditors' Committee Adversary Action | 15,785.50 |
| (7) | Employees' Adversary Action | 32,759.00 |
| (8) | Consumer Refunds | 740.00 |
| (9) | Disbursement Expenses | 14,325.43 |
| | | $299,960.58 |

In addition, GECC sought chapter 11 administrative priority for the fees and expenses set forth in categories (1), (7), and (9) of its amended application. The total amount for which GECC requests chapter 11 administrative priority status in its amended application is $80,494.50.

The trustee has objected in part to GECC's amended application. He apparently does not object to GECC's request for allowance of attorneys' fees and expenses in the amount of $299,960.58. He has, however, objected to its request for allowance of the attorneys' fees and expenses set forth in categories (1), (7), and (9) as chapter 11 administrative expenses.

An evidentiary hearing was held on GECC's amended application and the trustee's objections thereto on December 28, 1994. At the hearing, GECC asked that category (2)—i.e., attorneys' fees incurred in negotiating a postpetition financing agreement—also be accorded chapter 11 administrative priority status. With the inclusion of this category, the total amount for which GECC seeks chapter 11 administrative priority is $160,134.50.

The trustee disclosed at the evidentiary hearing that, as things then stood, it was unlikely that any funds will be available for distribution to chapter 11 administrative claimants. Future activities, he projected, would add additional funds, making a distribution to chapter 11 administrative claimants possible. With the consent of all parties, determination of this matter was postponed pending global settlement discussions. When it became clear that a global settlement was not possible prior to determination of this matter, an order was issued on March 27, 1995, advising the parties that the issues submitted on December 28, 1994 would be decided.

On February 3, 1995, some five (5) weeks after the evidentiary hearing was held, GECC submitted a document entitled "Amended Request For Payment Of Administrative Expense Pursuant To Section 503 Of The Bankruptcy Code". In addition to requesting administrative priority for all of the categories identified above, GECC requested an administrative priority in the amount of $41,247.66 for refunds the trustee made to consumers with funds allegedly subject to its postpetition lien.

The matter unfortunately does not end there. On April 10, 1995, more than three (3) months after the evidentiary hearing and long after we had begun in earnest to draft this memorandum opinion, GECC filed with the court yet another document. The document is captioned "General Electric Capital Corporation's Response To Trustee's Objection To Amended Petition Of General Elec-

tric Capital Corporation For Approval Of Attorney's Fees And Expenses". As far as we can ascertain, GECC replies in this submission to the trustee's response to the amended request it filed with the court on February 3, 1995.

## II

## DISCUSSION

Section 503 of the Bankruptcy Code provides as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—....

(3) the actual, necessary expenses, other than compensation and reimbursement specified in subparagraph (B) of this subsection, incurred by—....

(D) a creditor ... in making a substantial contribution in a case under chapter 9 or 11 of this title ...

(4) reasonable compensation for professional services rendered by an attorney ... of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses other than in a case under this title....

11 U.S.C. § 503.

▪ The above provisions authorize payment as an administrative expense of the reasonable and necessary attorneys' fees and expenses of a creditor that has made a "substantial contribution" in a chapter 11 proceeding. *See Matter of Buckhead America Corporation,* 161 B.R. 11, 15 (Bankr.D.Del. 1993). If the creditor has not made a "substantial contribution, the fees incurred do not qualify under § 503(b)(4). Attorneys for creditors may look to the bankruptcy estate for compensation **only** as to services incident to the conferral of administrative status for expenses of creditors pursuant to § 503(b)(3). *See 3 Collier on Bankruptcy,* (15th ed. 1995) ¶ 503.04[4] at 503–55.

▪ The term "substantial contribution" is not defined in the Code. It has, however, been universally construed as requiring a contribution that provides tangible benefit to the bankruptcy estate and to unsecured creditors. *See In re Buttes Gas & Oil Co.,* 112 B.R. 191, 194 (S.D.Tex.1989). Extensive participation in a case, standing alone, is not sufficient to justify granting a claim administrative priority status. *See In re McLean Industries, Inc.,* 88 B.R. 36, 38 (Bankr. S.D.N.Y.1988). Moreover, not just any benefit will suffice in this context. Incidental benefit to the estate, without more, is an insufficient basis for administrative priority status. *See Matter of Jack Winter Apparel, Inc.,* 119 B.R. 629, 633 (E.D.Wis.1990). An expense a creditor incurs that is solely or even substantially in furtherance of its own narrow self-interest is not entitled to chapter 11 administrative priority. *See Matter of Indiana Walnut Products, Inc.,* 136 B.R. 522, 524 (Bankr.N.D.Ind.1991); *Matter of Jack Winter Apparel, Inc.,* 119 B.R. at 633.

▪ The objective of the above Code provisions is to foster and encourage meaningful creditor participation in the reorganization process. *See In re General Oil Distributors, Inc.,* 51 B.R. 794, 805 (Bankr. E.D.N.Y.1985). This objective, however, potentially conflicts with the policy of keeping administrative expenses to a minimum. *See Matter of Baldwin–United Corp.,* 79 B.R. 321, 338 (Bankr.S.D.Ohio 1987). The tension between these competing objectives mandates that § 503(b)(3)–(4) be strictly constructed. *See Manufacturers Hanover Trust Co. v. Bartsh (In re Flight Transportation Corp. Securities Litigation),* 874 F.2d 576, 581 (8th Cir.1989).

▪ A creditor is presumed to act primarily (if not solely) in its own interest and not for the benefit of the bankruptcy estate as a whole. They have the burden of proving, by a preponderance of the evidence, that they made the requisite "substantial contribution". *See Matter of Buckhead America Corp.,* 161 B.R. at 15.

▪ The following factors should be considered when making a determination as to "substantial contribution":

(1) whether the services were rendered solely to benefit the creditor or to benefit all parties in the case;

(2) whether the services provided a direct, significant, and demonstrable benefit to the estate; and

(3) whether the services duplicated those provided by attorneys for the debtor or the committee of unsecured creditors.

*See In re Jack Winter Apparel,* 119 B.R. at 633 (*citing In re Lister,* 846 F.2d 55, 57–58 (10th Cir.1988)).

As we noted, GECC requests chapter 11 administrative priority status pursuant to § 503(b)(4) for the following categories of services its attorneys provided:

| | |
|---|---:|
| Cash Collateral Order | $ 46,995.50 |
| Postpetition Financing Negotiations | 79,640.00 |
| Employees' Adversary Action | 32,759.00 |
| Consumer Refunds | 740.00 |
| | $160,134.50 |

Its request will be denied. GECC has failed to demonstrate satisfactorily that the requisite "substantial contribution" was made to debtors' estates for any of these categories.

## A) CASH COLLATERAL ORDER

 GECC requests chapter 11 administrative expenses in the amount of $46,995.50 for 261.8 hours of services its attorneys allegedly spent negotiating the cash collateral order. Its request will be denied.

Although the cash collateral stipulation did contribute somewhat to debtors' continued operations for a short while longer, GECC did **not** make the requisite substantial contribution to debtors' estates when it consented to the agreement. The primary (if not sole) beneficiary of the cash collateral stipulation was GECC. Any benefit inuring to debtors' estates as a result of the cash collateral stipulation was merely an incidental and fortuitous by-product and pales when compared to the benefits GECC derived therefrom.

This is evidenced by the lopsided nature of the cash collateral stipulation, which was tantamount to a contract of adhesion to which debtors had to consent if they wished to continue operating. For instance, GECC was granted a superpriority replacement lien against goods debtor acquired postpetition and their proceeds. GECC also was authorized to apply proceeds deposited into the first of the two bank accounts towards reduction of debtors' prepetition indebtedness. Also, GECC was authorized to lend funds in the first account back to debtors so that they could purchase General Electric products for resale to consumers. In exchange for such concessions, debtors were permitted to utilize the funds deposited into the second of the two accounts.

This conclusion is bolstered by the fact that GECC's counsel spent **hundreds** of hours working on the cash collateral stipulation. The most plausible explanation as to why so much time was spent on this endeavor is that GECC wanted to gain every possible benefit for itself from the cash collateral stipulation. While this is not improper, it does undercut any suggestion that the primary beneficiaries of the legal services of GECC's counsel provided were debtors' estates.

Had the benefit of debtors' estates been a primary consideration, far less time would have been required to reach agreement. No other party or creditor posed serious obstacles to such an agreement. The only reasonable explanation for why GECC's counsel spent 261.8 hours on the cash collateral stipulation is that GECC wished to fashion an agreement that would enable it to exact its pound of flesh without immediately inflicting a mortal wound upon debtors. In the brief interim, GECC's prepetition debt would be paid down to zero.

## B) POSTPETITION FINANCING NEGOTIATIONS

 GECC also requests chapter 11 administrative priority status in the amount of $79,640.00 for 420.7 hours its counsel spent negotiating a debtor-in-possession financing agreement. This request will be denied as no contribution, let alone a substantial one, was made to debtors' estates as a result of these activities.

Whirlpool and Maytag both reached postpetition financing agreements with debtors that this court eventually ratified. Although extensive negotiations on postpetition financing purportedly took place between debtors

and GECC, no such agreement was ever reached by the parties and then ratified by this court. We fail to understand how GECC contributed in any way to debtors' estates in pursuing these abortive negotiations.

In an attempt to establish a substantial contribution, GECC asserts that negotiations on postpetition financing were linked to negotiations on the cash collateral agreement, which negotiations came to fruition. According to GECC, it agreed to the use of its cash collateral because it anticipated eventually reaching agreement with debtor on postpetition financing. The contribution made by negotiations on postpetition financing, GECC argues, was the cash collateral agreement.

This argument is sophistic and the desired conclusion is *non sequitur*. If the argument proves anything at all, it establishes only that the related activity of negotiating a cash collateral stipulation may have conferred a benefit to some entity. It does not follow from this that the activities devoted to postpetition financing did so.

Even if the argument is not sophistic, it fails for yet another reason. We already have determined that the cash collateral agreement did not make the requisite substantial contribution to debtors' estates to qualify for chapter 11 administrative priority status. It would seem to follow from this that any other activities predicated on this ostensible benefit also must fail to qualify for chapter 11 administrative priority status.

## C) EMPLOYEE WAGE CLAIMS ADVERSARY ACTION

GECC requests chapter 11 administrative priority status in the amount of $34,469.00 for some three hundred hours its counsel purportedly spent in connection with Adversary No. 93–2093–BM, 158 B.R. 384, wherein debtors' employees sought to recover unpaid wages from Whirlpool, Maytag, and GECC.

GECC asserts that these attorneys' fees are entitled to chapter 11 administrative priority status because it made a substantial contribution when it contributed $26,928.00 from its own funds towards the global settlement of the action.

This argument is without merit and may be disingenuous. GECC did not make any contribution at all, let alone a substantial one, when it consented to the utilization of funds held by the trustee in which GECC had an interest to pay the employees' wages. As we noted previously when describing the complaint in that action, plaintiffs sought monetary and injunctive relief from, *inter alia*, GECC and only injunctive relief from the trustee.

According to plaintiffs, Whirlpool, Maytag, and GECC were jointly and severally liable pursuant to 11 U.S.C. § 506(c) for the employees' unpaid wages and benefits. Plaintiff did not assert or pursue monetary relief from the trustee or debtors' estate. The **only** parties against whom monetary liability was asserted were Whirlpool, Maytag, and GECC.

The trustee was merely a party whose presence in the case as a defendant was necessary so that plaintiffs could be accorded complete relief in the event they prevailed in their § 506(c) claims against Whirlpool, Maytag, and GECC. In addition to requesting a monetary judgment against Whirlpool, Maytag, and GECC in the *ad damnum* clause of the complaint, plaintiffs requested an order directing these defendants to pay that sum of money to the trustee and directing the trustee to pay these amounts over to debtors' employees.

In other words, plaintiffs did not seek to recover monetary damages from debtors' bankruptcy estates. They sought to recover their wages only from Whirlpool, Maytag, and GECC. Accordingly, when GECC consented in the global settlement agreement to permit the trustee to utilize funds under his control in which GECC had an interest as partial payment to plaintiffs, GECC was not magnanimously allowing the trustee to utilize its funds to pay a debt owed by debtors' estates. The debt in question was owed by, *inter alia*, GECC. In permitting the trustee to use funds in his possession to pay plaintiffs, GECC merely was allowing the trustee to take action that was solely for the benefit of GECC, not for the benefit of debtors' estates.

## D) CUSTOMER DEPOSIT REFUNDS

■ GECC also requests chapter 11 administrative priority in the amount of $740.00 for 6.2 hours of services its counsel allegedly provided in connection with refunds the trustee made to consumers who had paid in advance for merchandise they did not receive before debtors ceased doing business. These fees, GECC claims, are entitled to chapter 11 administrative priority status because it made a substantial contribution to debtors' estates when it consented to the utilization of funds in an account subject to its postpetition lien to make these refunds.

This argument is without merit. GECC did not make any contribution at all to debtors' estates, let alone a substantial one, when it consented to utilization of funds in an account subject to its postpetition lien to make refunds to consumers who had pre-paid for merchandise that was never delivered to them.

Even though the funds in question were placed in an account that was subject to GECC's postpetition lien, they were not subject to the lien. The cash collateral stipulation approved by this court granted GECC a postpetition lien against certain products acquired postpetition by debtor **and in the proceeds derived therefrom.**

The funds debtors had received from customers as pre-payment for merchandise and which had been erroneously deposited into accounts subject to GECC's postpetition lien were not "proceeds" derived from the sale of that merchandise. The merchandise in question, which undoubtedly was subject to GECC's lien, had not yet been sold to customers when the payments were received. These funds did not become subject to GECC's lien until the merchandise subject to its lien had been converted into cash proceeds. This never happened, as debtors ceased operating before these customers received the merchandise for which they had pre-paid.

When GECC consented in the omnibus motion regarding administration of the chapter 7 estates that was approved on December 31, 1992, to allow the trustee to utilize approximately twenty-eight thousand dollars ($28,000) in an account subject to its lien, it was "agreeing" to allow the trustee to use funds in which it did not yet have an interest. Accordingly, GECC did not confer any benefit upon debtors' estates when it so consented.

Moreover, GECC would reap an unwarranted windfall in that it would enjoy a double recovery. As we noted previously, GECC was granted relief from the automatic stay with respect to products subject to its security interest and converted the products to cash when it returned them to manufacturers. Were we to allow GECC's request for administrative priority as to consumer deposit refunds, it also would recover cash prepayments for products that were not sold to the consumers but instead were converted to cash by GECC.

One final matter remains to be addressed in connection with the refunds made to these customers.

On February 3, 1995, some five (5) weeks **after** the evidentiary hearing, GECC submitted a document entitled "Amended Request For Payment Of Administrative Expense Pursuant To Section 503 Of The Bankruptcy Code".

In this submission, GECC requested an additional administrative priority pursuant to § 503(b)(3) in the amount of $41,247.66, which it claims it "allowed" the trustee to utilize to satisfy the above customers. According to GECC, the trustee:

> ... deducted $29,392.83 for payment of consumer claims from the $44,466.00 owed to GE Capital. In addition, in July of 1994, GE Capital paid an additional $11,854.83 to the trustee in satisfaction of the claims that these consumers would have had against the debtor.

Nothing was offered at the evidentiary hearing on December 28, 1994, concerning this matter. The question of allowing this sum as an administrative expense was not "on the table" as it had not been requested by GECC. Consequently, we will not address this request here.

However, if we had to decide it now, we would deny the request. As we just indicated, the funds GECC "allowed" the trustee to

use to reimburse customers were not "proceeds" subject to GECC's postpetition lien. GECC did not confer a benefit upon debtors' estates when it "allowed" the trustee to do so.

An appropriate order shall be issued.

### ORDER OF COURT

AND NOW at Pittsburgh this 27th day of April, 1995, in accordance with the accompanying Memorandum Opinion, it hereby is **ORDERED, ADJUDGED** and **DECREED** that the request of General Electric Capital Corporation for allowance of attorneys' fees and expenses in the amount of $299,960.58 is **ALLOWED,** as no party in interest has objected to same and as *sua sponte* action by the court will not change the basic result.

IT IS FURTHER **ORDERED** that GECC's request for allowance of a chapter 11 administrative priority expenses in the amount of $160,134.50 is **DISALLOWED.**