In re: ALUMNI HOTEL CORPORATION, 17017 Blue Realty Corporation, Villa Holding Corporation, Debtors.

Bankruptcy Nos. 91–10696, 95–44349 and 95–53977.

United States Bankruptcy Court, E.D. Michigan, Southern Division.

Nov. 26, 1996.

As Amended Dec. 30, 1996.

Daniel Weiner, Bloomfield Hills, MI, for Fine & Davenport.

Linda Hammell, NLRB, Detroit, MI, for NLRB.

Kevin Ball, Birmingham, MI, for trustee.

John Adam, Southfield, MI, for HERE Local 24 & HERE Funds.

### MEMORANDUM OPINION REGARDING MOTION FOR ALLOWANCE OF ATTORNEY FEES OF MARTIN FINE

STEVEN W. RHODES, Chief Judge.

Martin Fine and the Davenport Entities have filed a motion for allowance of attorney fees under 11 U.S.C. § 503. The issue is whether these legal fees should be allowed as

an administrative expense of the debtors' estate(s) under 11 U.S.C. § 503(b)(3)(D) and (b)(4). The Court concludes that the fees should not be allowed, as the applicants have not made a substantial contribution to the debtors' estates.

## I. *The Application*

Defendants Martin Fine and "the Davenport Entities," corporations affiliated with Fine,[1] seek payment and/or reimbursement of $25,807.25 in attorneys fees and $273.72 in costs as administrative expenses of the estate(s) of Alumni Hotel Corporation, 17017 Blue Realty Corporation, and Villa Holding Corporation. Fine contends that by proposing and designing a settlement of the trustee's adversary proceeding, his counsel produced a "substantial contribution" to these three estates and, therefore, the estates should bear the expense of counsel under 11 U.S.C. § 503(b)(3)(D) and (b)(4).

## II. *The Estates*

This matter concerns the estates of three different debtors: Alumni Hotel Corporation, 17017 Blue Realty Corporation, and Villa Holding Corporation. These corporations shared two important attributes: 1) the same individual, Martin Fine, was the sole shareholder and managing officer of each of these corporations; and 2) each of the corporations was connected to the ownership and/or management of a hotel located at 17017 West Nine Mile Road, Southfield, Michigan. The entangled affairs of these companies generated hundreds of pleadings in their bankruptcies and culminated in an adversary proceeding to determine the true ownership of the hotel property. The attorneys' fees at issue arose during the adversary proceeding. In order to understand the adversary proceeding, a brief history of the three underlying bankruptcy cases is included in the summary of facts.

### A. *Alumni Hotel Corporation*

Alumni Corporation, doing business as the Days Hotel, operated at 17017 West Nine Mile Road, Southfield, Michigan, from September 27, 1989 to May of 1993. In May of 1993, Alumni ceased operating as a Days Hotel and became a Ramada Hotel.[2] Martin Fine was the president and sole shareholder of Alumni.[3] From 1989 through the pendency of the Alumni bankruptcy case, the hotel property was the subject of several transactions. According to Alumni's disclosure statement(s), Alumni Hotel Corporation purchased the real and personal property of the hotel from Prudential Insurance Company, using a $4 million loan from Fine, in a sale which closed on September 27, 1989. On March 19, 1990, Fine, as president of Alumni, executed a quit-claim deed which transferred title to the property to 649 Broadway Equities Company, a partnership in which Fine is a partner. The quit-claim deed indicated that the transfer was for "$1 and other good and valuable consideration." Fine later maintained that Broadway received the property in exchange for $200,000 and an agreement that Broadway would assume the $4 million obligation to repay Fine.[4] Alumni

---

1. The application for allowance of fees does not define the "Davenport Entities." Presumably, this term refers to the defendant corporations in the adversary proceeding—649 Broadway Equities Co., Davenport Trading Corp., Twelve Lions Renaissance Corp., 644 BRDY Realty, Inc., and WCC BOCA Corp.—who are affiliated with and/or controlled by Martin Fine.

2. During the pendency of its bankruptcy case, Alumni terminated its Days Hotel franchise agreement and entered into a franchise agreement with Ramada, which the court approved on May 18, 1993.

3. Alumni's Fourth Amended Disclosure Statement provided following description of Martin Fine: "The debtor's principal, Martin Fine, is an individual who holds three college degrees: University of Pennsylvania, B.A., 1960; University of Michigan Law School, J.D., 1963 and New York University Law School, L.L.M., 1965. He has been involved in real estate investments for over 20 years and has specialized in turnarounds of distressed real estate businesses, and the operation and management of buildings. Mr. Fine, in his early days[,] was in fact a bellhop at a major hotel and his subsequent 20 years of legal and real estate experience have provided him with sufficient opportunity to understand the necessities of operating a single building major hotel operation."

4. Fine also maintained that Broadway and Alumni entered into their sale agreement on September 27, 1989, and that March 19, 1990 was simply the date that this agreement "closed." (Alumni's Response to Objections to Disclosure Statement filed August 6, 1993 and Fourth Amended Debtor's Disclosure Statement filed September 13, 1993). However, Alumni's 1990

then leased the hotel property from Broadway. The record contains a copy of the lease, which shows that on March 19, 1990, Fine, acting as Alumni's representative, entered into a twenty-year lease agreement with Broadway, also represented by Fine, for total rent of $4,800,000, payable in monthly installments of $20,000. On September 16, 1991, Martin Fine, as a partner of Broadway, gave the Israel Discount Bank of New York a mortgage on the hotel property as security for a guarantee for "a certain obligation of Davenport Trading Corp.", another corporation owned by Fine.[5]

On September 23, 1991, Alumni filed a voluntary petition for chapter 11 relief. Martin Fine remained as Alumni's director. Alumni's schedules disclosed that its chief assets were a Days Hotel franchise agreement, valid through September 1999, and the Broadway leasehold agreement for the hotel property.[6] The schedules disclosed that Alumni owed Broadway a considerable amount of unpaid rent and that Broadway held a security interest in the lease.[7] In addition, Alumni's disclosure statement, filed August 5, 1992, stated that "entities controlled by Mr. Fine have prepetition unsecured claims in the approximate amount of $1,500,000.00."[8]

On November 28, 1991, Martin Fine, acting as president of Broadway, executed a quit-claim deed transferring the hotel property to 17017 Blue Realty Corporation, a corporation in which Fine served as president and sole stockholder. The deed stated that the property was exchanged "for the sum of $1." On April 30, 1992, Fine, acting as president of Blue Realty, gave the Israel Discount Bank of New York a mortgage on the hotel property as security for Blue Realty's guarantee of "certain obligations of Davenport Trading Corp., Twelve Lions Renaissance Corp., 644 BRDY Realty Inc., WCC BOCA Corp., and Martin R. Fine."[9] On August 5, 1993, Fine, acting as president of Blue Realty, again gave the Israel Discount Bank of New York a mortgage on the hotel property as security for Blue Realty's guarantee of "certain obligations of Davenport Trading Corp., Twelve Lions Renaissance Corp., 644 BRDY Realty Inc., WCC BOCA Corp. and Martin R. Fine."[10]

On February 15, 1994, the court appointed a trustee in Alumni's chapter 11 case and ordered the trustee to report whether Alumni should remain in chapter 11 or be converted to chapter 7. On March 8, 1994, trustee Charles Taunt reported that Alumni's case should be converted to chapter 7, as Alumni had incurred substantial losses during the case and had no reasonable likelihood of rehabilitation. The trustee recommended that the hotel business be liquidated by sale as a going concern, rather than simply shutting down the business and auctioning Alumni's few assets. The trustee believed that to be most effective, the sale should take place as soon as possible and that the buyer should fund the operational losses which would occur in the pendency of the court's approval of the sale and the closing. The trustee noted that Martin Fine's related businesses may be able to purchase the hotel.

federal tax return reported that Alumni owned the building at the beginning of the tax year as an asset valued at $3,339,612, and that on March 1, 1990, Alumni sold the asset for $4.2 million.

5. The principle amount of the obligation was $500,000.

6. The schedules also disclosed that Alumni had assets of furnishings, fixtures, and leasehold improvements worth $145,000. However, in a Motion to Assume Non–Residential Real Property Executory Contract, the debtor's attorney stated that 649 Broadway Equities Co. owned the physical assets of the building, including furniture and fixtures of the hotel.

7. Schedule D, filed October 16, 1991, indicated that Broadway was Alumni's primary secured creditor, with a $220,000 claim for unpaid rent, secured by the hotel lease.

8. Schedule F, filed October 16, 1991, listed creditors holding unsecured non-priority claims. Schedule F showed a claim by Broadway for a loan of $500,000; a claim by Davenport Trading Corporation, a corporation in which Fine has an interest, for a loan of $444,381; and a claim by Smythe–Burton Consulting Corporation, a corporation in which Fine has an interest, for $575,000. These claims total $1,519,381.

9. The principal amount of the obligations amounted to $500,000.

10. The principal amount of this obligation was $1,500,000.

On April 25, 1994, the court ordered that Alumni's case be converted from chapter 11 to chapter 7. In accordance with the trustee's recommendation that the hotel be sold as a going concern, the trustee received court permission to enter into an agreement with one of Martin Fine's corporations, the Villa Holding Corporation, which allowed Villa to operate the hotel, receive its revenues, and pay its expenses, for the period from April 26, 1994 until September 15, 1994. In exchange for receipt of all hotel revenue, Villa was to pay the Alumni estate $5,000 per month.

On April 29, 1994, the trustee moved for court permission to sell Alumni's assets, consisting primarily of inventory, accounts, and the Ramada franchise agreement, to two corporations controlled by Martin Fine, the Smythe–Burton Consulting Corp. and Villa Holding Corporation. These corporations offered to pay $200,000 for these assets, as follows:

$30,000 cash at closing;

$40,000 cash upon successful transfer of the hotel's liquor license;

$100,000 release of a super-priority claim of Smythe–Burton;

$30,000 assumption of liability for advance deposits made for use of the hotel;

and subordination of Blue Realty's claims (for unpaid rent) to all other claims against the estate. Various creditors filed objections to the proposed sale. These objections were eventually resolved, and the court entered an order approving sale of Alumni's meager assets to Smythe–Burton and Villa on September 22, 1994, on the terms listed above.

This was not the end of the matter, however.

### B. Litigation Over Property Located at 17017 West Nine Mile Road

On April 24, 1995, the trustee filed an adversary action alleging that Martin Fine and the companies which he controlled engaged in fraudulent transfers involving the hotel property which were allegedly designed to hinder, delay, or defraud creditors of Alumni. The trustee argued that the real property located at 17017 West Nine Mile Road, Southfield, Michigan, should be considered part of Alumni's estate. The complaint named Martin Fine and his related companies, Blue Realty, 649 Broadway Equities Company, and five corporations in which Martin Fine was a shareholder and officer: Davenport Trading Corp., Twelve Lions Renaissance Corp., 644 BRDY Realty Inc., WCC BOCA Corp., and Villa Holding Corporation.[11] The complaint also named the Israel Discount Bank of New York, which held mortgages on the hotel property.

The trustee alleged that although Fine, Blue Realty, and Fine's affiliated businesses purported to be separate entities, "Fine manipulated and dominated [Alumni] and Blue [Realty], stripping [Alumni] of the real estate, [Alumni's] most important asset."[12] The trustee alleged that Alumni's leasehold interest in the hotel property was a sham designed to insulate the debtor's interest in the hotel property from creditors. The trustee also claimed that the sale of the hotel property to Broadway and, later, to Blue Realty, was actually nothing more than a financing transaction. The trustee sought a declaration that the hotel property was property of the Alumni estate, along with a decree setting aside the Israel Discount Bank of New York's mortgages.

### C. 17017 Blue Realty Corporation

The 17017 Blue Realty Corporation described its business as "own[ing] and leas[ing] real estate." Blue Realty was incorporated in Michigan, although its address was Martin Fine's office address at 644 Broadway, New York, New York. Martin Fine was the chief executive officer, president, and sole shareholder of the Blue Realty Corporation. Blue Realty's principal asset was the real property located at 17017 West Nine Mile Road, Southfield, Michigan.[13] Mr.

---

**11.** Although Villa was not initially a named defendant in the *Taunt v. Blue Realty* case, Villa was named as a party in the First Amended Complaint, filed October 24, 1995.

**12.** *Taunt v. 17017 Blue Realty Corp., et al. (In re Alumni Hotel Corporation )*, First Amended Complaint, p. 5.

**13.** Although the Blue Realty schedules initially disclosed "no inventory," Mr. Fine stated at the

Fine stated at the Blue Realty 341 hearing that 649 Broadway Equities Company sold the property to Blue Realty in 1991. Mr. Fine also stated that Blue Realty had never obtained an appraisal of the property, although he estimated that the property was worth $2 million.

On April 25, 1995, the day after Alumni's trustee filed the adversary action against Fine, Blue Realty, and others, Blue Realty filed a voluntary petition for relief under chapter 11. The schedules showed that Blue Realty's chief tenant was Villa Holding Corporation, which entered into a lease of the hotel property on April 29, 1994.

### D. *Villa Holding Corporation*

The Villa Holding Corporation, doing business as the Ramada Inn Southfield, was located at 17017 W. Nine Mile Road, Southfield, Michigan. Villa described the nature of its business as "hotel lessee" and "hotel operator," and showed Martin Fine as the sole shareholder and president of Villa.

On December 26, 1995, Villa filed a voluntary petition for relief under Chapter 11. Villa disclosed that its primary assets were the lease for 17017 W. Nine Mile Road and the Ramada Inn Franchise Agreement.[14] Villa listed Blue Realty as a creditor owed $107,000 for rent. Villa's schedules disclosed 644 BRDY Realty, Inc. and Twelve Lions Renaissance Corp. as creditors.

### E. *Settlement of the Trustee's Adversary Litigation*

On the eve of the trial in the Alumni trustee's adversary proceeding, the trustee and the defendants entered into a settlement agreement. The agreement provided that Alumni's trustee would also become trustee for the Blue Realty and Villa estates and would assume control of the real property and the other hotel assets, such as the hotel furniture. The agreement acknowledged

341 hearing that Blue Realty actually owned the furniture within the hotel.

**14.** Villa's schedules also listed assets of furniture and miscellaneous hotel personal property of $36,000.

**15.** By December of 1993, the NLRB assessed the wage and benefit claims, with administrative expenses and interest, as $431,895.

that certain creditors had filed similar claims against each of these estates and provided a method for resolving those claims.

Under the agreement, the Fine corporations received an administrative expense priority claim of $200,000 and, in addition, an unsecured, subordinated claim totaling $1,519,000, which would be paid only after certain other claimants were paid. The Fine corporation, Smythe–Burton Consulting, received $40,000 in connection with the hotel liquor license. Claims of unionized hotel employees for unpaid wages, benefits, and penalties were reduced to $250,000 [15] and given administrative priority in exchange for a release of all past and pending claims against Fine and the Fine corporations. The Israel Discount Bank agreed to a secured claim of $500,000 against the debtors.[16] The parties also agreed that the proceeds from the sale or disposition of the hotel property and all assets of the three debtors would be distributed in a certain order to various creditors, including the Internal Revenue Service; the State of Michigan; the Michigan Employment Security Commission; Oakland County; the City of Southfield; all allowed pre-petition priority claims; and all allowed general unsecured claims. On January 23, 1996, the Alumni trustee filed a "Motion for Settlement of Litigation, Compromise of Claims, and Other Relief" which set out the terms of the agreement and asked for the court's approval. Although the union and Oakland County initially objected to some provisions of the settlement, they withdrew their objections and agreed to the settlement, and on February 26, 1996, this Court entered an order approving the settlement.

On May 23, 1996, this Court entered an order approving sale of the Ramada Inn hotel property, and the property was sold for $2.5 million.

**16.** The Israel Discount Bank had asserted a secured claim against the hotel property of $2,234,073.84. It agreed to release all but $500,000 of this claim in the settlement, although it did not release any claims against Fine's other non-debtor companies.

## III. *Discussion*

Fine and corporations in which he has an interest seek payment of some of their attorneys' fees which were incurred during the period beginning December 20, 1995, and ending August 1, 1996. Fine contends that his counsel rendered a substantial benefit to the Alumni, Blue Realty, and Villa estates because they "spearheaded" the "beginning of settlement discussions" in December of 1995 and were "the chief architect of a novel settlement framework to address all of the assets and liabilities in three separate, independent estates together[.]" Counsel asserts that it was "the designer of the various levels of priorities for payments" and that it "supplied the vision and structure to create order from chaos," thereby avoiding "many hours of discovery, preparation and litigation" and bringing the bankruptcy cases to a more expeditious conclusion. Fine concedes that he received a benefit from the settlement, but contends that the settlement also substantially benefitted all parties by providing a "significant savings of expense to the estates."

11 U.S.C. § 503(b) provides that a creditor's attorney fees may be allowed as administrative expenses of the debtor's estate under certain circumstances. Section 503 reads, in relevant part:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under § 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the

nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such an attorney or accountant[.]

■ Subsections 503(b)(3)(D) and 503(b)(4) have been described as "an accommodation between the twin objectives of encouraging 'meaningful creditor participation in the reorganization process,' and keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors." *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir.1994) (internal citations omitted). *See also Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249, 1253 (5th Cir. 1986); *In re United States Lines, Inc.*, 103 B.R. 427, 429 (Bankr.S.D.N.Y.1989); *General Elec. Capital Corp. v. Nigro (In re Appliance Store, Inc.)*, 181 B.R. 237, 242 (Bankr. W.D.Pa.1995). Administrative expenses under § 503(b) are priority claims paid directly from the bankruptcy estate and reduce the funds available for creditors and other claimants. Accordingly, § 503(b) is strictly construed. *Mfrs. Hanover Trust Co. v. Bartsh (In re Flight Transp. Corp. Sec. Litig.)*, 874 F.2d 576, 581 (8th Cir.1989); *In re United States Lines, Inc.*, 103 B.R. at 429.

■ The bankruptcy court exercises its discretion to determine whether to allow administrative expenses and the appropriate amount of expense to award. *In re Lister*, 846 F.2d 55, 56 (10th Cir.1988); *In re Consol. Bancshares, Inc.*, 785 F.2d at 1252. Whether the applicant has rendered a substantial contribution which entitles him to an allowance is a question of fact for the court to determine. *Lebron*, 27 F.3d at 946; *In re Flight Transp. Corp. Sec. Litig.*, 874 F.2d at 582. The burden is on the applicant to prove by a preponderance of the evidence that he has made a substantial contribution. *In re Lister*, 846 F.2d at 57; *In re Appliance Store, Inc.*, 181 B.R. at 242. The applicant bears this burden because as a creditor, he owes no fiduciary obligation to the bankruptcy estate and is presumed to act in his own best interest. *In re Flight Transp. Corp. Sec. Litig.*,

874 F.2d at 581; *In re United States Lines, Inc.*, 103 B.R. at 430; *In re Appliance Store, Inc.*, 181 B.R. at 242; *Lebron v. Mechem Fin. Inc.*, 27 F.3d at 943–44. As one court has articulately explained,

> Compensation cannot be freely given to all creditors who take an active role in bankruptcy proceedings. Compensation must be preserved for those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate ... The integrity of Section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or the estate.

*In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 690 (Bankr.S.D.Cal.1988).

A. *§ 503(b)(3)(D) does not allow fees for the Alumni Chapter 7 case.*

 Fine's motion for allowance of fees argues that the requirements of § 503(b)(3)(D) and (b)(4) are satisfied because the settlement orchestrated by Fine's counsel benefits three estates: Alumni, a Chapter 7 case; Blue Realty, a Chapter 11 case, and Villa, also a Chapter 11 case. By its own terms, § 503(b)(3)(D) and (b)(4) apply only in Chapter 9 and Chapter 11 cases. *See In re Beck–Rumbaugh Assoc., Inc.*, 68 B.R. 882 (Bankr.E.D.Pa.1987), *aff'd*, 84 B.R. 369 (E.D.Pa.1988) (no statutory authority to award compensation for substantial contribution in Chapter 7 case). Although the Alumni bankruptcy case began as a Chapter 11 proceeding and then converted to a Chapter 7 proceeding, all the work done by Fine's counsel occurred after the Chapter 7 conversion had taken place. Section 503(b)(3)(D) does not authorize fee awards for expenses incurred after a case is converted from Chapter 11 to Chapter 7. *Lebron*, 27 F.3d at 946. Therefore, Fine cannot rely on benefits to Alumni to support an argument for fees under § 503(b)(3)(D) and (b)(4).

B. *The applicants' status as "creditor" or "equity security holder."*

 As an initial matter, the applicant must establish that it is actually one of the parties allowed to apply for payment of expenses under § 503(b)(3)(D) and (b)(4). Section 503(b)(3) expressly applies to a creditor or an equity security holder. Martin Fine is an equity security holder of Blue Realty and Villa and can seek payment from these estates under § 503.

The application for allowance of fees describes "The Davenport Entities" as creditors. In fact, neither Blue Realty nor Villa list a creditor designated "The Davenport Entities." None of the Fine corporations involved in the adversary proceeding (649 Broadway Equities Co., Davenport Trading Corp., Twelve Lions Renaissance Corp., 644 BRDY Realty, Inc., and WCC BOCA Corp.) which presumably comprise the Davenport Entities are listed in Blue Realty's schedules or disclosure statement as creditors. Accordingly, the record does not support the assertion that these companies are creditors of Blue Realty which are entitled to seek expenses from the Blue Realty estate under § 503. Only two of these business, Twelve Lions Renaissance Corp. and 644 BRDY Realty, Inc., are listed in the schedules as creditors of Villa. Therefore, Twelve Lions Renaissance Corp. and 644 BRDY Realty are the only "Entities" entitled to bring this application under § 503 for payment from the Villa estate.[17]

C. *Fine, Twelve Lions Renaissance Corp. and 644 BRDY have failed to meet their burden of showing that their efforts and efforts of their counsel resulted in a "substantial contribution" to Blue Realty and Villa.*

 The billing records attached to Fine's motion for allowance of fees show that Fine's counsel actively participated in settlement discussions. However, extensive participation in a case, without more, does not constitute substantial contribution. *In re*

---

**17.** Although many of the Fine businesses were creditors of the Alumni estate, a creditor cannot seek payment of expenses under § 503(b)(3)(D) and (b)(4) in a chapter 7 case. As the preceding section explains, Alumni was proceeding under chapter 7 and, therefore, is irrelevant to the "substantial contribution" analysis here.

*United States Lines,* 103 B.R. at 430; *In re Best Prod. Co., Inc.,* 173 B.R. 862, 866 (Bankr.S.D.N.Y.1994); *In re Appliance Store,* 181 B.R. at 242. In order to meet the requirement of "substantial contribution" in § 503(b), an applicant must show that his efforts directly resulted in a demonstrable, material benefit to the debtor's estate and the creditors. *In re Lister,* 846 F.2d at 57; *Lebron,* 27 F.3d at 943–44; *In re Flight Transp. Corp. Sec. Litig.,* 874 F.2d at 582; *In re United States Lines, Inc.,* 103 B.R. at 429; *In re Appliance Store, Inc.,* 181 B.R. at 242. The court considers whether the applicant's services were rendered solely to benefit the creditor or to benefit all parties in the case; whether the services provided a direct, significant, and demonstrable benefit to the estate; and whether the services duplicated those provided by attorneys for the debtor or the committee of unsecured creditors. *In re Appliance Store,* 181 B.R. at 242–243 (citing *In re Jack Winter Apparel,* 119 B.R. 629, 633 (E.D.Wis.1990)). Services which would "merely deplete the assets of an estate without providing a corresponding greater benefit" are not allowed under § 503(b)(3)(D) or § 503(b)(4). *In re United States Lines,* 103 B.R. at 429 (citing *In re Texaco, Inc.,* 90 B.R. 622, 632 (Bankr.S.D.N.Y.1988)); *In re Ace Fin. Co.,* 69 B.R. 827, 831 (Bankr.N.D.Ohio 1987); *In re Baldwin–United Corp.,* 79 B.R. 321, 344 (Bankr.S.D.Ohio 1987).

■ Here, Fine and his counsel claim that their efforts toward settlement and toward creating a plan for distribution of proceeds constitute "substantial contribution." There is no question that a settlement agreement was ultimately reached in this case, and there is no dispute that Fine's counsel worked diligently to define the terms of settlement. However, encouraging negotiation and proposing agreeable terms is a routine task, and often the professional obligation, of a creditor's counsel. There is nothing extraordinarily beneficial to the debtors about such activity. The fact that these negotiations did not take place until Fine and his corporations were forced to defend against an adversary proceeding suggests that Fine was primarily motivated by a desire to limit his individual and corporate liability, not by

an interest in participating in the reorganization process.

As with any good settlement, this settlement provided some benefits to the parties and also required the parties to accept some concessions. Although the estates and certain creditors benefitted to some extent from the settlement, Fine and his counsel cannot take credit for actually settling the case, because settlement is not a unilateral action. In order to reach a settlement, all the interested parties, including the Alumni trustee, the union employees and the National Labor Relations Board, the tax authorities and other creditors, reached an agreement. If Fine's fees were allowed under § 503(b)(3)(D) and (b)(4) for negotiating to reach agreement, all the parties to this settlement might well argue that they, too, made a "substantial contribution" by agreeing to compromise their claims.

Fine's counsel argues that this settlement was especially beneficial because it resolved three bankruptcy proceedings at once. As explained above, § 503(b)(3)(D) and (b)(4) do not encompass claims for contribution to the Alumni Chapter 7 case. The settlement did resolve pending disputes in two Chapter 11 cases, Blue Realty and Villa. In essence, the settlement consolidated the assets of the three estates to share among the creditors who had filed claims against each estate. Although this might be a unique manner of settlement, it was possible here because of the close pre-petition relationship of these debtors to each other and to Fine. This prepetition relationship initially hindered the reorganization process by generating litigation over the ownership of the hotel property and causing the Alumni creditors to also assert their claims against Blue Realty and Villa. It spawned the adversary litigation, in which the Alumni trustee asserted that the assets of Blue Realty and Villa actually belonged to the Alumni estate. The adversary proceeding was filed to determine the ownership of the hotel real estate/property and gathered all three debtors into one forum to resolve this issue. Settling the issue of which estate was entitled to the property would necessarily affect all three debtors' cases. Under these circumstances, the Court is not per-

suaded by Fine's argument that "substantial contribution" occurred when the Blue Realty and Villa cases were resolved with a single settlement.

Fine and his attorneys argue that if these same expenses were submitted by the Alumni trustee or the attorneys for the debtors-in-possession, they would be compensable. Fine argues that "[t]here is no reason, therefore, that the same tasks, performed by counsel for a creditor or equity security holder[,] should be treated any differently." This argument flies in the face of the Bankruptcy Code, which expressly mandates different standards for allowing compensation for a creditor's legal expenses than for the trustee's legal expenses. The trustee's counsel may be compensated for reasonable, necessary expenses, even if counsel did not render a "substantial contribution" to the estate, the debtor, or creditors.[18] In contrast, the Code requires a creditor to show a "substantial contribution" before his expenses will be considered compensable.

Finally, this Court must note that although the Court never found that Fine or his entities committed any fraud or any fraudulent conveyance, because the adversary proceeding alleging these claims was settled, it is nevertheless abundantly clear that the complexity of these estates and the transactions among them was caused by Fine himself and no one else. It is equally abundantly clear that fairness and equity will simply not permit this Court to grant Fine's request for fees for his attorneys, to the prejudice of creditors, to settle the difficult legal issues arising from the complexity of the estate and the transactions that he created.

### IV. *Conclusion*

This Court finds that Fine and his related businesses have failed to show that they and their counsel produced a "substantial contribution" to the Blue Realty and Villa estates which would entitle them to recoup fees from the debtors' estates under § 503(b)(3)(D) and (b)(4).

18. 11 U.S.C. § 330(a)(1)(A).

An appropriate order denying the motion will be entered.