PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 96-6981

D. C. Docket No. CV-94-G-1572-NE
Bkcy Court. No. 88-6467

IN RE: DAS A. BORDEN & COMPANY,

                                        Debtor.

ED LEIGH McMILLAN, II,
MONTFORD COMPANIES, INC.,

                                        Plaintiffs-Appellees,

                              versus

JOSEPH DECOSIMO AND COMPANY,

                                        Defendant-Appellant,

DAS A. BORDEN & COMPANY,

                                        Defendant.

Appeal from the United States District Court
for the Northern District of Alabama

**(December 31, 1997)**

Before HATCHETT, Chief Judge, FAY and FARRIS*, Senior Circuit
Judges.

---

*Honorable Jerome Farris, Senior U.S. Circuit Judge for the Ninth
Circuit, sitting by designation.

FAY, Senior Circuit Judge:

Appellant Joseph Decosimo and Company ("Decosimo"), an accounting firm, appeals a district court's decision to reverse a bankruptcy court order granting Decosimo $99,053.10 in accounting fees as an administrative expense of the bankruptcy estate of Das A. Borden & Company. Decosimo contends the district court erred in substituting its judgment for that of the bankruptcy court. Because it appears from the record and from our review of the applicable law that Decosimo improperly sought compensation for accounting work that was not reasonable and necessary to the maintenance of the bankruptcy estate of the debtor, we find no error on the part of the district court and therefore affirm its order.

## I. BACKGROUND

### A. The Historical Facts

#### 1. The Parties

The factual setting for this dispute is a bit complicated. Appellant Decosimo is an accounting firm hired by Das A. Borden ("Borden"), individually, and by Das A. Borden and Company (the "Company"). Between January 1, 1990 and August 28, 1993, Decosimo performed various accounting services including consulting, tax audit duties, and other professional services for the Company, Borden, and certain limited partnerships affiliated with the Company and/or Borden. It is Decosimo's work for Borden and the eighteen other related entities that is the basis of this dispute. The other entities are Turtle Lake, Ltd. ("Turtle Lake"), Navarro

2

Place Associates ("Navarro"), Riverchase, Ltd. ("Riverchase"), Greentree Place Apartments ("Greentree"), Willow Wood Ltd. ("Willow Wood"), Wood Village Ltd. ("Wood Village") and twelve HUD-assigned partnerships ("HUD"). With the exceptions of Willow Wood and Wood Village, all of these partnerships had filed for bankruptcy, with all of the bankruptcy cases, except that of Greentree, filed in the U.S. Bankruptcy Court for the Northern District of Alabama. Greentree's bankruptcy case was filed in New Orleans, Louisiana. The appellees are Ed Lee McMillan, II, and McMillan's assignee, the Montford Companies, Inc. (collectively "McMillan"). McMillan is a secured creditor of the Company and Borden. Pursuant to a cash collateral agreement, McMillan is obligated to pay the allowed administrative expenses necessary to wind up the Company's bankruptcy case.[1]

## 2. Chronology

On July 8, 1988, the Company filed its voluntary petition for Chapter 11 relief in the United States Bankruptcy Court for the Northern District of Alabama. On July 11, 1988, Borden consented

---

[1]Initially, Ed Lee McMillan, II, was a guarantor of $3,000,000 of debt of the Company and Borden owed to AmSouth Bank. At that time, First United Bank was a $4,500,000 secured creditor of the Company and Borden. Its security was the partnership interests and distributions, management fees, and advances to the partnerships of the Company and Borden. When First United Bank made public to all parties in interest that it desired to sell its secured claim, Mr. McMillan purchased the secured claim of First United Bank and then allowed his cash collateral, consisting largely of management fees, to be used by the Company to pay certain expenses necessary to preserving the Company's bankruptcy estate. In the cash collateral agreement, this practice became formalized and Mr. McMillan agreed to have his cash collateral applied to the administrative expenses necessary to the preservation of the Company's estate.

to the entry of an order of relief under Chapter 7.[2]  On July 12, 1988, Borden converted his bankruptcy case to one under Chapter 11. At the time of the commencement of the Company's and Borden's bankruptcy cases, the Company and Borden were general partners of approximately 40 limited partnerships which operated various apartment complexes throughout the southeast.[3]

On October 8, 1991, the bankruptcy court approved the employment of Decosimo as accountants for the Company.  The application stated that it was necessary for the Company to employ the accountants for a number of reasons.[4]  In 1992, Borden applied

---

[2]An involuntary bankruptcy petition had been filed against Borden on April 18, 1988.

[3]Turtle Lake, the 12 HUD-assigned partnerships, Navarro, Riverchase, Willow Wood, and Wood Village were among the forty limited partnerships.  Borden alone was a general partner of Greentree.

[4]The reasons, as stated in the application, were limited to the following:

(a) Said accountants must prepare federal and appropriate state income tax returns of Das A. Borden & Company for the year ended March 31, 1991, in accordance with the attached engagement letter dated September 23, 1991, made exhibit A to this application;
(b) Said accountants are to assist Debtors-In-Possession in preparing periodic statements of the Debtors-In-Possession operations as required by the rules of this court or the Estate Analyst;
(c) Said accountants must inspect and verify financial records and reports and review financial transactions;
(d) Said accountants must review claims and advise concerning the financial computations and bases for claims;
(e) Said accountants must advise concerning the tax aspects of various partnership activities and the impact upon Debtors-In-Possession of partnerships of which for which Debtors-In-Possession are general partners; and
(f) Said accountants are to render such other accounting services as will probably be required by Debtors-In-

to the bankruptcy court to have Decosimo perform personal accounting work for Borden individually and this separate application in a separate bankruptcy case was similarly approved.

In September of 1993, McMillan, the Company, and the Unsecured Creditor's Committee entered into an agreement in the Company bankruptcy case which called for the liquidation of the Company and payment of a small dividend to unsecured creditors. Under the terms of this cash collateral agreement, McMillan agreed to the use of his cash collateral to pay the administrative expenses necessary to close the Company case. After an objection by Decosimo, McMillan agreed to include Decosimo's accounting fees as an administrative expense of the Company's case if such fees were deemed by the bankruptcy court to have administrative expense priority. On October 4, 1993, the bankruptcy court entered an order approving the cash collateral agreement.

Prior to the court order approving the agreement, on September 30, 1993, Decosimo filed applications for payment in the Borden and Company bankruptcy cases seeking payment from the Company for various accounting services. The fees in dispute in the instant case include:

1. Borden's Personal Tax Work -- (1991) -- $31,961.07 for work on Borden's federal and state income tax returns, tax accounting, and research and consulting.

2. Greentree -- (1992) -- $6,025.00 for tax and audit services, preparation of K-1's.

3. Turtle Lake -- (1990) -- $5,793.75 for services performed in 1990 related to litigation.

Possession.

5

4.  The Twelve HUD-Assigned Partnerships -- (1992) -- $15,000.00 for preparation of financial statements to be submitted to HUD relating to various audits and tax returns.

5.  Navarro -- (1991 & 1992) -- $12,981.22 for preparation of federal and state income tax returns and K-1's, assistance in preparation of a plan of reorganization and in supplementing disclosure statements.

6.  Riverchase -- (1992) -- 2,266.66 for services relating to compiling tax basis financial statements and preparation of federal and state tax returns and K-1's.

7.  Willow Wood -- (1990, 1991, & 1992) -- $15,875.00 for an audit of the financial statements and preparation of federal and state tax returns and Schedule K-1's.

8.  Wood Village -- (1991 & 1992) -- $8,650.00 for performance of audit services and preparation of federal and state tax returns and Schedule K-1's.

Over the objections of McMillan, the Company, and Borden, on April 22, 1994, the bankruptcy court entered an order allowing all claims in the Company case. [5]  McMillan appealed to the district court. The district court conducted a de novo review of the record and reversed the award of accounting fees.  Decosimo appeals to this court seeking a reinstatement of the bankruptcy court order.


## II.  Standard of Review

Our standard of review of the bankruptcy court's findings of fact is the clearly erroneous standard, while conclusions of law made by the bankruptcy court or the district court are reviewed de novo.  In re Miller, 39 F.3d 301, 304-05 (11th Cir. 1994).  As the second court of review in this bankruptcy matter, this court's

_____

[5]McMillan disputes the process provided by the bankruptcy court after the bankruptcy court tried the case without allowing McMillan access to Decosimo's source documents and work product.

6

review of the decision of the district court is entirely <u>de novo</u>. <u>In re Sublett</u>, 895 F.2d 1381, 1384 (11th Cir. 1990). As this court explained in <u>In re Sublett</u>, when a district court reverses the factual findings of a bankruptcy court, we must be independently convinced, upon <u>de novo</u> review, that the factual findings by the bankruptcy court were clearly erroneous. <u>Id.</u> at 1384 n.5. However, when the question at issue depends upon a proper construction of the Bankruptcy Code by the bankruptcy court or district court, we subject such interpretations to <u>de novo</u> review. <u>In re Haas</u>, 48 F.3d 1153, 1155 (11th Cir. 1995).

### III. Discussion

Decosimo contends that in providing accounting services to Borden individually and to various limited partnerships[6] to which the Company was either a general partner, managing partner, or managing agent, Decosimo was acting on behalf of the Company's interests and is, accordingly, entitled to compensation for the accounting services provided. The issue before this court is not whether Decosimo is entitled to be compensated for the accounting work done for Borden and the limited partnerships. Rather the issue to be resolved by this court is whether the fees for such services are to be categorized as an administrative expense of the Company's bankruptcy estate, for which McMillan would be liable under the cash collateral agreement. We hold that the accounting fees in dispute arising from services provided to Borden and the

---

[6]Again, the Decosimo fees in dispute are for Borden, Turtle Lake, Navarro, Riverchase, Greentree, the twelve HUD partnerships, Willow Wood, and Wood Village.

7

limited partnerships are not administrative expenses of the Company's bankruptcy estate entitled to a favored priority, and that the bankruptcy court's decision to the contrary was in error as a matter of law.

Initially, McMillan contends that Decosimo's accounting fees for services provided to Borden and the limited partnerships are not administrative expenses of the Company's estate because Decosimo never received, as per 11 U.S.C. § 327(a),[7] the required prospective approval in the Company case to provide services to any of these challenged entities. While it is clear that Decosimo never received prospective approval for the accounting services for Borden and the limited partnerships, it is not clear that such prospective approval is an absolute requirement. So far as we can ascertain, this court has never grappled with the issue of whether § 327(a) of the Bankruptcy Code permits the nunc pro tunc,[8] or post facto,[9] approval of professional services after the services have

_____

[7]The pertinent statute states that "the trustee, with the court's approval, may employ one or more . . . accountants . . . to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). The Company, as a debtor in possession, has the right to appoint professionals such as accountants through the operation of 11 U.S.C. § 1107(a) which grants to the debtor in possession all the rights (except the right to receive compensation), powers, functions and duties of a trustee serving in a case under Chapter 11.

[8]Nunc pro tunc literally means "now for then". See In re Singson, 41 F.3d 316, 318 (7th Cir. 1994).

[9]It has not escaped our attention that Judge Easterbrook has noted that the use of the appellation " nunc pro tunc" in this context is confusing given the use of that term in connection with the correction of court records. See Singson, 41 F.3d at 318. However, given that the parties in this dispute have elected to refer to such after the fact authorization as nunc pro tunc

already been rendered.  In light of other grounds mandating affirmance of the district court order, we reserve our opinion on the propriety of <u>nunc pro tunc</u> authorizations for another dispute demanding the resolution of this divisive issue.[10]

The narrow issue to be resolved by this court is whether the accounting services in dispute were actual and necessary to the administration of the bankruptcy estate of the Company so as to render McMillan liable for payment of such services under the cash collateral agreement as an administrative expense.  We hold that the accounting fees at issue were clearly not necessary to the upkeep and maintenance of the bankruptcy estate of the company and we therefore affirm the district court.  "The threshold requirement for an administrative expense is that it be actual and necessary to the preservation of the estate; the benefit must run to the debtor and be fundamental to the conduct of its business."  <u>In re Colortex Indus., Inc.</u>, 19 F.3d 1371, 1383 (11th Cir. 1994). [11]  Here any benefit from the accounting services rendered by Decosimo ran to

---

authorization, we will refer to it by that name in this opinion.

[10]In 1983, the Fifth Circuit offered a brief review of the split between circuits on this issue of the requirement of prior court approval under § 327(a). <u>See</u> <u>In re Triangle Chemicals, Inc.</u>, 697 F.2d 1280, 1285-88 (5th Cir. 1983).  Since 1983, several decisions on this subject have been issued by federal courts. <u>See, e.g.</u>, <u>In re Jarvis</u>, 53 F.3d 416, 419-21 (1st Cir. 1995); <u>Singson</u>, 41 F.3d at 319-20; <u>In re Land</u>, 943 F.2d 1265, 1267-68 (10th Cir. 1991); <u>In re F/S Airlease II, Inc.</u>, 844 F.2d 99, 105 (3d Cir. 1988); <u>In re THC Financial Corp.</u>, 837 F.2d 389, 391-92 (9th Cir. 1988).

[11]The compensation Decosimo seeks under 11 U.S.C. § 330(a)(1) specifically provides that the compensation is to be for "actual, necessary services."

9

Borden, individually, and to eighteen separate entities to which the Company was either a general partner, managing partner, or managing agent. While it is clear from the record that the personal accounting work done for Borden is not an administrative expense of the Company for which McMillan is liable,[12] the accounting work for the eighteen limited partnerships is a bit more complicated.

Decosimo argues that under Alabama law the Company, as a partner or managing agent of these partnerships, is obligated for the debts of these partnerships.[13] Assuming, without deciding, that such is correct, the avenue for recovery for fees for Decosimo would not be as an administrative expense, but as an unsecured creditor. Accounting fees arising from services performed for other debtors in separate bankruptcy proceedings and arising from work for entities other than the debtor in this case are not fees incurred in the upkeep and maintenance of this debtor's estate and therefore are not to be reimbursed as an administrative expense. The tenuous and incidental benefit Decosimo alleges it provided the

---

[12]There is no written or verbal agreement by either the Company or McMillan to pay for the accounting services rendered to Borden. Decosimo contends that Borden told Decosimo that McMillan would pay for these services. The Company was never invoiced for these services; in fact, Decosimo only invoiced Borden in its search for payment. Consequently, there is no legal basis to allow Decosimo and administrative claim against the Company's estate for these services.

[13]Decosimo contends Ala. Code § 10-8-52(2) renders the Company liable for the debts of the various partnerships. § 10-8-52 states: "All partners are liable . . . (2) Jointly and severally for all debts and obligations of the partnership, except as may be otherwise provided by law."

Company, without more, is insufficient basis for administrative priority status. See In re Appliance Store, Inc. , 181 B.R. 237, 242 (Bankr. W.D. Pa. 1995). Rather than give Decosimo a leg up on the other creditors of the Company by granting its fee claims administrative expense priority, we would require Decosimo to proceed against each of the parties for whom the services were rendered. If Decosimo is successful in its suits against these limited partnerships, and if it were found that the Company is liable for Decosimo's fees, then Decosimo would stand as a creditor of the Company, no more and no less. Given the Bankruptcy Code's overriding concern for keeping administrative expenses to a minimum so as to preserve as much of the estate as possible for the creditors, we must carefully review the legitimacy of such claims. See Otte v. United States, 419 U.S. 43, 53 (1974). Decosimo's fees for work performed for other entities are simply not administrative expenses of the Company for which McMillan is liable under the cash collateral agreement.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the United States District Court for the Northern District of Alabama.

AFFIRMED.

11