**In re FINEVEST FOODS,
INC., et al., Debtor.**

**Bankruptcy Nos. 91–614–BKC–3P1
through 91–619–BKC–3P1.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Sept. 15, 1993.

James H. Post, Jacksonville, FL, for debtor.

Steven Klugman, New York City, for claimant.

Lisa Gretchko, Detroit, MI, for Campbells Soup.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon motion for administrative expense of Southeast Frozen Food Company, Limited Partnership ("Claimant"). A hearing was held on December 10, 1992, and June 6, 1993, and upon the evidence presented the Court enters the following findings of fact and conclusions of law:

*Findings of Fact*

Finevest Foods, Inc., was the parent company of Southeast Frozen Foods, Inc., ("debtor") a wholesale distributor of frozen foods. Debtor's Twin Packing division[1] distributed fresh fruits and vegetables. As a dealer of fresh and frozen fruits and vegetables, debtor was required to be licensed by the United States Department of Agriculture ("USDA") pursuant to the Perishable Agricultural Commodities Act ("PACA") 7 U.S.C. § 499c (1988).

Debtor filed for chapter 11 reorganization on February 11, 1991, after an involuntary petition was filed against it.

Debtor's management team consisted of John Robinson, President; Dennis Fairchild, Chief Financial Officer; Thomas Zupan, Director of Warehousing and Transportation; Richard Newcomb, Vice–President of Management Information Systems; and Sherwin Levy, Vice–President of Procurement. Within a week of debtor's filing for bankruptcy these officers, with the exception of Levy, resigned.

Approximately three weeks after resigning, the four officers entered into a consulting agreement with claimant to study the business in contemplation of purchasing the assets of the debtor. The consulting agreement also provided that claimant would employ the four after acquisition.

---

1. Finevest also sold its Twin Packing division. The transaction was separate from the sale of debtor.

In accordance with its intention to purchase the assets and business of debtor, claimant began negotiations with Philip Ablove, President and Chief Executive Officer of Finevest, and Brian Kelly, in-house counsel and secretary of debtor. One of claimant's investors, James Petras, and the law firm of Jones, Day, Revis and Pogue negotiated on behalf of claimant.

On May 10, 1991, debtor and claimant entered into an asset purchase agreement whereby claimant acquired essentially all of the assets of debtor. The agreement contained warranties of buyers and sellers. This Court approved the sale at a hearing held on May 31, 1991, and the sale closed on June 14, 1991. Robinson, Fairchild, Zupan, and Newcomb were employed as officers of claimant on the closing date.

In January and February, 1991, debtor received letters from vendors indicating their intentions to preserve trust benefits pursuant to PACA. 7 U.S.C. § 499e (1988). Letters were found in the offices occupied by Mr. Fairchild and Mr. Robinson prior to their resignations. Mr. Fairchild noted on one letter "file reclaim file."

On April 25, 1991, a complaint was filed in this Court by an unpaid produce vendor alleging that it was entitled to trust benefits under PACA. A second complaint, styled as a class action suit, was filed on May 6, 1991, alleging that the three named complainants and others qualified for trust benefits. Both complaints sought payment from debtor.

In response to these suits, on May 17, 1991, debtor deposited $797,844.69 into an interest bearing account to pay qualified PACA creditors.

On June 25, 1991, debtor received a letter from the USDA identifying thirty-eight vendors that it believed were entitled to trust protection and directing debtor to deposit $1,602,576.00 into an interest bearing account to pay qualified claimants. Debtor deposited $1,602,576.00 into the account established on May 17, 1991.

In March, 1993, the USDA served a complaint on debtor alleging non-payment of vendors in violation of PACA and seeking to revoke debtor's PACA license. USDA also notified Mr. Robinson, Mr. Fairchild, Mr. Zupan, and Mr. Newcomb that it considered them "responsibly connected" parties and that if the USDA prevailed on its complaint against debtor employment and licensing restrictions could be imposed upon them.

Claimant entered into a settlement with USDA. Pursuant to the settlement, USDA dismissed with prejudice the responsibly connected proceeding against claimant's four officers in exchange for claimant's full payment of eleven PACA creditors.

On May 13, 1992, claimant filed its request for payment of administrative expense estimated at $1,400,000.00 alleging that debtor breached the warranties in the asset purchase agreement by failing to disclose the alleged PACA violations prior to the closing of the sale. Claimant seeks reimbursement of the amount of the settlement and its attorney fees expended in reaching the agreement.

### Conclusions of Law

The Code addresses the allowance of administrative expense claims in § 503(b)(1)(A). That section states in pertinent part as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, ..., including—

(1)(A) the actual necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

The party asserting an administrative expense claim has the burden of proving by a preponderance of the evidence entitlement to priority status. *In re Finevest,* 140 B.R. 581 (Bankr.M.D.Fla.1992). To establish entitlement to an administrative expense claim, the claimant must show (1) the claim arose from a post-petition transaction and (2) the transaction actually benefitted the estate. *Id.; In re Apollo Moving Specialists of Daytona Beach,* 137 B.R. 538 (Bankr.M.D.Fla.1992).

Debtor concedes that the asset purchase agreement was a post-petition transaction because it was negotiated and consummated post-petition and that the receipt of the $20 million purchase price benefitted debtor's estate. Thus, all that is left for this Court to decide is the validity of claimant's contract claims and the amount, if any, that is entitled to administrative expense status.[2]

### Validity of Expense Claim

### Warranty Provisions

The controversy between debtor and claimant revolves around the warranties contained in § 4.1.7 regarding compliance with laws, § 4.1.9 regarding litigation and § 4.2.4 regarding buyer's knowledge. The warranties state:

4.1.7 *Compliance with Laws* (a) Except as set forth on Schedule 4.1.7. hereto, since February 15, 1991, seller has not received any written or oral notice of or citation for noncompliance with any Law including without limitation, laws relating to the environment (collectively "Environmental Laws"), in connection with the acquired assets or the business; and (b) except as set forth on Schedule 4.1.7, to the best of Seller's knowledge, there exists no fact, condition, situation or circumstance, which after notice or lapse of time or both, would constitute noncompliance with or give rise to future liability with respect to any such Laws.

4.1.9 *Litigation* Except as disclosed on Schedule 4.1.9 hereto and except for Seller's filing of the bankruptcy Petition, (i) Seller is not subject to any order of, or agreement, memorandum or understanding with, any Governmental Authority applicable to any of the Acquired Assets or the Business, and (ii) there is no litigation, action, suit proceeding or claim or investigation pending, or, to the best of Seller's knowledge, threatened against

Seller and any of the Acquired Assets, the transactions contemplated by this Agreement or the ability of Buyer after the Closing to use the Acquired Assets and conduct the Business in substantially the same manner as they are used and conducted on the date hereof.

4.2.4 *Buyer's Actual Knowledge* On the date hereof, Buyer has no actual knowledge of any facts or events that conflict with or otherwise cause to be untrue any of the representations and warranties of Seller set forth in Sections 4.1.3 through 4.1.6, 4.1.7(b) and 4.1.9.

Both parties assert that the other had knowledge of debtor's failure to pay its vendors and thus knew of its violation of PACA's prompt payment requirements. 7 C.F.R. 46.46 The parties allege that the failure to disclose this knowledge constitutes a breach of warranty.

Debtor's former officers knew that debtor was not paying its vendors. Mr. Fairchild was responsible for deciding which vendors received payment after Finevest allocated funds for payment. Mr. Fairchild stated in his deposition that he knew that vendors had not been paid prior to debtor's bankruptcy filing and that it would be a long time before payment would be made. In addition, while consulting for claimant, Mr. Fairchild contacted some of debtor's vendors to insure they would conduct business with the new company, and at that time some of the vendors inquired when debtor would pay them.

In January and February, 1991, Mr. Fairchild received letters from Pillsbury Company; Stilwell Foods, Inc.; Tri–Star Marketing & Distribution; and Safeway Stores, Inc., stating that the companies intended to preserve trust benefits under PACA. Mr. Fairchild wrote "file reclaim file" on the Stilwell letter and showed Larry Coley, debtor's loss prevention manager, where to

---

**2.** Counsel for Campbell Soup Company participated in the hearings on this administrative expense claim and concurred in debtor's post-hearing brief and findings of fact and conclusions of law. Campbell Soup also submitted a brief arguing that claimant's administrative expense claim should be denied because it is ineq-

uitable for claimant to pay in full PACA creditors that failed to preserve their trust benefits while other unsecured creditors will receive much less than full payment. The Court finds that this argument is without merit as it is contrary to the law.

locate the notices. Mr. Fairchild testified that he was not aware of any trust notices sent to him. Mr. Fairchild also stated that he had not read the letters filed in his office or the letter on which he had written.

Likewise, Mr. Robinson received letters from McCain Foods and Tri–Star Marketing & Distribution indicating their intention to preserve trust benefits during January and February 1991. As did Mr. Fairchild, Mr. Robinson testified that he had not read the letters and was unaware of debtor's potential PACA problems. Mr. Robinson also testified that debtor had accounts payable just as it always did, consequently some vendors had not been paid prior to bankruptcy. Thus, just as Mr. Fairchild knew, Mr. Robinson had knowledge that some vendors were not paid pre-petition and remained unpaid post-petition.

Mr. Fairchild completed the application for renewal of debtor's PACA license and testified that he only read enough of the application to fill it out.. The front of the application contains a box requesting the applicant indicate whether it distributes fresh, frozen, or both types of fruits and vegetables. Mr. Fairchild checked the box indicating that debtor dealt in both types of products. However, Mr. Fairchild indicated that he thought that PACA only applied to fresh produce and not to frozen items. In November, 1990, Mr. Fairchild told Finevest management that failure to pay creditors pursuant to PACA could have grave consequences.

The Court finds that Mr. Fairchild and Mr. Robinson knew that vendors remained unpaid and also knew that vendors had notified debtor and USDA of their intention to preserve trust benefits pursuant to PACA. The Court also finds that Mr. Fairchild was aware that PACA applied to both Twin Packing and debtor and that failure to pay was a violation of PACA requirements.

The officers' knowledge is imputed to claimant because corporations possess knowledge through their agents. *Bertram Yacht Yard v. Florida Wire and Rigging Works,* 177 So.2d 365 (Fla. 3rd DCA 1965); 3 Fletcher Encyclopedia of the Law of Corporations § 790. The Court finds that claimants breached the buyer's warranty in § 4.2.4 because debtor's former officers possessed actual knowledge of facts that caused the warranties given by debtor in § 4.1.7(b) and § 4.1.9 to be untrue.

Section 12.5 of the asset purchase agreement states that the agreement is governed by Florida law. Under Florida law, when a party fails to perform a dependent covenant, the failure discharges performance of the other party. *Sun City Holding Company v. Schoenfeld,* 122 So. 252 (Fla.1929); *Slaughter v. Barnett,* 154 So. 134, 137 (Fla.1934). In *Sun City* the court said that whether a covenant is dependent is based upon "the intention of the parties ... and [must be] regarded in the light of all the circumstances evidenced by the contract." Mr. Kelly testified that he negotiated the contract consistent with the belief that claimant possessed greater knowledge than debtor. Thus debtor accepted the warranties in section IV on the condition that claimant provide the § 4.2.4 warranty which makes specific reference to the warranties contained in § 4.1.3 through § 4.1.6, § 4.1.7(b) and § 4.1.9. Thus the parties intended the warranties referenced in § 4.2.4 rise or fall together, and they were dependent covenants. Because claimant breached its warranty, debtor cannot be bound by the warranties included in the § 4.2.4. *Id.* Thus claimant cannot enforce § 4.1.3 through § 4.1.6, § 4.1.7(b), and § 4.1.9.

### Release

Claimant argues that even if its officers possessed actual knowledge making seller's warranties unenforceable it is still entitled to an administrative expense claim because debtor released any and all claims that arose prior to or on the date of the closing. Claimant cites the release provisions included in the agreement to support its contention.[3] The releases state in pertinent part as follows:

---

3. The releases contemplated by the parties were objected to by the creditors' committee so new

1. SEFF hereby irrevocably and unconditionally releases and forever discharges FFAC and each of its Affiliates (as defined in section 3 hereof), the respective present, future and former partners, shareholder, directors, officers, employees and agents of each of such aforementioned Persons ... as well as any and all assets of any of the FFAC Related Parties, from any and all claims, actions, demands, causes of action, suits, accounts, rights of levy, execution or rescission, remedies, obligations, damages, costs, expenses and liabilities whatsoever, of every name and nature (collectively, "Claims"), whether in law or in equity, whether or not fixed ... which SEFF or any of the SEFF Related Parties ... has or ever has had against any of the FFAC Related Parties at *any time on or prior to the date hereof* and which arose in connection with the negotiation or consummation of the transactions contemplated under the Asset Purchase Agreement and any actions taken by FFAC or the FFAC Related Parties relating thereto or in connection therewith. [emphasis added]

2. FFAC hereby irrevocably and unconditionally releases and forever discharges SEFF and each of its respective Affiliates, the respective present, future and former partners, shareholders, directors, officers, employees and agents of each such aforementioned Persons ... as well as any and all assets of any of the SEFF Related Parties, from any and all Claims, ... which FFAC or any of the FFAC Related Parties has or ever has had against SEFF or any of the SEFF Related Parties at *any time prior to the date hereof* and which arose in connection with the negotiation or consummation of the transactions contemplated under the Asset Purchase Agreement and any actions taken by SEFF or the SEFF Related Parties relating thereto or in connection therewith. [emphasis added]

Sections 7.1.2 and § 7.2.2. state in pertinent part as follows:

7.1.2 *Accuracy of Representations and Warranties; Performance of Covenants.* The representations and warranties of Seller contained in the Agreement shall be true and correct as made, both on the date of this Agreement and as of the Closing Date (as though such representations and warranties were made anew on the Closing Date)....

7.2.2 *Accuracy of Representations and Warranties; Performance of Covenants.* The representations and warranties of Buyer contained in this Agreement shall be true and correct as made, both on the date of this Agreement and as of the Closing Date (as though such representations and warranties were made anew on the Closing Date).

Debtor argues that the releases and the warranty accuracy sections of the agreement are repugnant because claimant's release would release claims as they arose.

 The Court agrees that the provisions are inconsistent. When a contract contains conflicting or repugnant clauses, an ambiguity exists. *Dune I v. Palms North Owners Ass'n,* 605 So.2d 903 (Fla. 1st DCA 1992). In such situations the Court must reconcile the conflicting terms, if possible, and if one interpretation would lead to an absurd conclusion then that interpretation should be abandoned and one adopted that accords with a reasonable, logical and rational interpretation. *Triple E Development Co. v. Floridagold Citrus Corp.,* 51 So.2d 435 (Fla.1951). The Court must, while reconciling inconsistent provisions, give effect to all of the contract terms in accordance with the parties' intentions. *Excelsior Ins. Co. v. Pomona Park Bar & Package,* 369 So.2d 938 (Fla.1979); *Dune I v. Palms North Owners Ass'n,* 605 So.2d 903 (Fla. 1st DCA 1992).

In *James v. Gulf Life Ins. Co.* the court said,

[the] contradiction of the general purpose of the contract is weighty evidence that

releases that addressed the committee's concerns were drafted and signed after the purchase agreement was executed.

such meaning was not intended when the language is open to an interpretation which is neither absurd nor frivolous and is in agreement with the general purpose of the parties. 66 So.2d 62, 63 (Fla.1953). In this case, claimant's interpretation contradicts the general purpose of the asset purchase agreement which was to sell the assets while allocating the risks of possible future events through warranties. If the release provisions are interpreted as claimant argues, the risk allocation of the warranties is nullified. Accordingly, the releases should be construed so that claims arising from the warranties in the agreement are not released as they arise, but other claims that may arise are released. In this way all the terms of the contract are effective, and the construction is in accord with reason and the parties' intentions as evidenced by the contract as a whole.

### Section 4.1.7(a)

■ The Court has determined that claimant breached its dependent warranty and that claimant's release does not nullify the other warranties in the agreement. Thus the question remaining is whether debtor violated the warranty contained in part (a) of § 4.1.7 which is not included in the § 4.2.4 warranty. The warranty contained in § 4.1.7(a) is violated if debtor had any "written or oral notice or citation for noncompliance with any Laws ..." after February 15, 1991.

Debtor argues that the notice in § 4.1.7(a) applies only to notice received from a governmental agency and that, even if the notice referenced in § 4.1.7(a) includes other sources, it does not include the adversary complaints filed in debtor's bankruptcy case because the complaints only request payment from debtor and do not allege violations of law. Debtor also argues that even if the proceedings constitute notice it remedied any possible noncompliance by placing funds in trust to pay PACA claimants.

Claimant urges that the Court find the adversary proceedings provide sufficient notice and argues that when the parties intended for notice to be limited to that received from a governmental agency the contract specifically states the limitation. Claimant cites § 4.1.8 of the contract in support of its argument. Section 4.1.8 is as follows:

4.1.8 Environmental Matters. Except as set forth in schedule 4.1.7 hereto, since February 15, 1991, seller has not received any notice from any Governmental Authority or other person advising....

Section 4.1.7(a) and § 4.1.8 are similar, if not redundant, because both require any notice of noncompliance with environmental or other laws to be listed in schedule 4.1.7 and each section requires the disclosure of all types of notice of noncompliance. However, § 4.1.8's specific reference to notice from a governmental agency invalidates debtor's argument that the notice contemplated in § 4.1.7(a) refers only to notice from the government because the parties made specific reference to such notice when notice from a governmental agency was the type intended. Thus, it is clear that the notice in § 4.1.7(a) is not limited to that received from a governmental agency.

The adversary proceeding complaints allege that debtor is subject to the regulations contained in PACA and that the action seeks enforcement of § 499e(c)(2)'s statutory trust. The May 6, 1991, complaint states, in paragraph 20, that debtor's failure to hold the commodities received from plaintiffs in trust pursuant to PACA "constitutes violations of PACA and PACA regulations, and is unlawful." (Cl. Ex. 8) Plaintiffs reallege defendant's violation of PACA in paragraph 23, and in paragraph 28 plaintiffs allege that defendant is in "violation of its statutory duty...." Because the notice provision in § 4.1.7(a) was intended to include notice from any source and because the "class action" adversary proceeding specifically alleges debtor's violation of law, the Court finds that the complaints provide sufficient notice of noncompliance with laws. Consequently, the adversary complaints constitute notice pursuant to § 4.1.7(a).

Debtor's outside counsel provided copies of filings in the bankruptcy case to debtor through debtor's agent, Mr. Kelly. Mr. Kelly testified in his deposition that he did not specifically recall reading the complaints prior to signing the asset purchase agreement on May 10, 1991, but that he assumed that he had seen the complaints prior to the closing on June 14, 1991.

Also, Mr. Ablove testified at his deposition that he attended a hearing in this Court that resulted in a stipulation for payment of PACA claimants. Thus, both Mr. Kelly and Mr. Ablove received notice of the alleged PACA violations and knew of debtor's stipulation to resolve the claims. However, contrary to debtor's assertion, the stipulation did not change debtor's duty to disclose because § 4.1.7(a) requires disclosure of notice of noncompliance not debtor's subsequent remedial measures.

■■■ Next, debtor argues that claimant cannot enforce the warranty because claimant's management knew of debtor's potential PACA violations so claimant did not rely on debtor's disclosure and that claimant is estopped from enforcing a breach of § 4.1.7(a). *Hobco, Inc. v. Tallahassee Assoc.*, 807 F.2d 1529 (11th Cir.1987); *Erwin v. Jackson*, 22 F.2d 56 (4th Cir.1927).

The Court does not agree with either of debtor's arguments. The time covered by the § 4.1.7(a) warranty is specifically limited to after Robinson, Fairchild, Zupan and Newcomb departed. The warranty was specifically negotiated and claimant did not have knowledge from that period of time. Consequently, claimant relied on the warranty contained in § 4.1.7(a) and the warranty is valid.

Debtor cites *Erwin v. Jackson* in support of its estoppel argument. 22 F.2d 56 (4th Cir.1927) *Erwin* is distinguishable because there the plaintiff possessed full knowledge of the facts prior to the sale and concluded the sale anyway. Although claimant's officers knew that vendors were taking steps to preserve their trust benefits under PACA, unlike the buyers in *Erwin*, claimant did not have full knowledge because the officers did not know of the adversary proceedings nor did they know

of the possible consequences to their management. The warranty contained in § 4.1.7(a) requires debtor to disclose any notice received subsequent to claimant's officers leaving the debtor's employ. Claimant's officers did not possess the knowledge required to be disclosed in § 4.1.7(a). Consequently, claimant is not estopped from asserting a claim based on debtor's breach of the warranty contained in § 4.1.7(a).

Finally, debtor argues that claimant is seeking indemnity from debtor and, because claimant did not afford it due process in settling the claim, it cannot recover on its indemnity claim. The Court does not agree that claimant is seeking indemnity, and so claimant's refusal of debtor's offer to defend the USDA is not fatal to its claim.

The Court finds that claimant has proven its entitlement to an administrative expense claim by a preponderance of the evidence. The Court finds that claimant has shown that debtor breached the warranty contained in § 4.1.7(a), and the Court must now determine the amount that is entitled priority status.

### Amount of Expense Claim

Claimant argues that it is entitled to recover the amount paid to the USDA for settling the responsibly connected proceeding and the attorney fees expended to effectuate that outcome.

### Settlement Cost

■■■■ The USDA dismissed the responsibly connected proceeding against claimant's officers in exchange for payment of $306,223.00 to eleven PACA creditors. The USDA initially asserted a claim for $700,000.00. Claimant decreased the amount required through investigation and negotiations with the USDA.

Debtor argues that claimant is not entitled to recover damages because claimant failed to show that its injury was caused by debtor's breach of warranty and that claimant failed to mitigate its damages. Debtor

also argues that claimant should not have settled the case and has failed to show that the officers would have been sanctioned as responsibly connected parties.

The Court does not agree. The asset purchase agreement required debtor inform claimant of any notice debtor received of noncompliance with law. Debtor failed to provide this notice and, consequently, claimant was unable to fully assess its position in completing the asset purchase. After the sale, claimant found that its least expensive course of action was to pay $306,223.00 to settle the potential liability against its management. Thus claimant incurred exactly the type of obligation the warranties were intended to avoid.

The Court finds that debtor has shown that it is very likely that the proceeding would have been decided adversely to claimant, that settling the matter was reasonable and that the settlement cost was caused by debtor's failure provide full disclosure.

Pursuant to Florida law when a contract is defectively performed, the injured party is entitled to recover the reasonable cost of conforming the performance to the contract. *Gleason v. Title Guarantee Company*, 300 F.2d 813 (5th Cir.1962). In this case, the amount necessary to conform what was received to what was promised was $306,223.00. Thus, the Court finds that the amount paid to PACA claimants to settle the USDA action is an administrative expense of the estate.

### Attorney Fees

The Court does not find that the attorney fees expended by claimant to settle the action are an administrative expense priority. Absent a specific provision in the parties' agreement providing for attorney fees in the event of a breach, the Court cannot award fees because the law does not provide authority for such an award.

Claimant argues that attorney fees are authorized in *In re G.I.C. Government Securities* and should likewise be authorized here. 121 B.R. 647 (Bankr.M.D.Fla.1990) In *G.I.C.*, the Trustee pursued an action

against E.F. Hutton for damages on behalf of the estate. E.F. Hutton prevailed and was awarded fees and costs as an administrative claim. The Court found that the suit was an attempt to benefit the estate, and so the fees were entitled to be treated as administrative expense.

In contrast, here, claimant resolved the USDA complaint in an effort to protect its management from possible employment sanctions. Claimant's actions in defending this proceeding did not have the potential to benefit debtor's estate as did the trustee's action in *G.I.C.*, thus the Court declines to apply its reasoning in this case. *See also, In re Keegan Utility Contractors, Inc.*, 70 B.R. 87 (Bankr.W.D.NY 1987) (attorney fees incurred without court order and were not rendered directly to debtor not entitled to administrative expense).

Second, the Court finds that both debtor's and claimant's attorney-negotiators should have done a better job of investigating the status of debtor and its PACA creditors prior to the consummation of the asset sale. Neither side investigated the effect of PACA on debtor even though debtor's PACA licenses were included in the sale. The Court declines to reward claimant for its failure to fully investigate the assets it was purchasing by awarding attorney fees.

Finally, the Court finds that the evidence presented as to attorney fees was insufficient to allow an award. Claimant's managing general partner, Mr. Bertoldi, testified that Mr. Olsson, the attorney representing claimant with the USDA, had billed claimant for $61,000.00. Mr. Olsson's billing records were put into evidence, however, no evidence of the factors required by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) was presented, thus the evidence is insufficient for an award of attorney fees.

### Conclusion

The Court finds that debtor breached the warranty contained in § 4.1.7(a) of the asset purchase agreement and that claimant is entitled to an administrative expense claim in the amount of $306,223.00. The

claim for attorney fees for $61,000 is denied. A separate order consistent with these findings of facts and conclusions of law will be entered.

*ORDER GRANTING IN PART AND DENYING IN PART MOTION OF SOUTHEAST FROZEN FOOD COMPANY, L.P. FOR ADMINISTRATIVE EXPENSE*

This case came before the Court upon Motion for Administrative Expense filed by Southeast Frozen Food Company, Limited Partnership. Upon findings of fact and conclusions of law separately entered it is,

ORDERED

1. Claimant's Motion for administrative expense for $306,223.00 paid in settlement of eleven PACA creditors claims and for dismissal of a responsibly connected proceeding is granted.

2. Claimant's Motion for administrative expense for $61,000.00 for attorney fees expended in settlement with United States Department of Agriculture is denied.