**In re Paula LICKMAN, Debtor.**

**No. 98–02632–6C7.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Feb. 21, 2002.

Gerald J. D'Ambrosio, Boca Raton, FL, for debtor.

Marie E. Henkel, Orlando, FL, trustee.

### DECISION ON DEBTOR'S APPLICATION FOR ADMINISTRATIVE EXPENSE

C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

This case came on for final evidentiary hearing on August 10, 2001, of the debtor's application for administrative expense (Document No. 52) and the trustee's objection to the debtor's application for administrative expense (Document No. 84).

### I.

The file reflects the following procedural history:

The Chapter 7 debtor filed an application for administrative expense (Document No. 52) on December 22, 1999, in the amount of $17,000. On June 22, 2001, the trustee objected to the debtor's application (Document No. 84). On June 28, 2001, the court entered an order directing a response to the trustee's objection (Docu-ment No. 89). On July 5, 2001, the debtor filed a motion to dismiss the trustee's objection (Document No. 91). The court then set the dispute involving the debtor's application for administrative expense for final evidentiary hearing on August 10, 2001 (Document No. 92).

At the hearing, the court orally denied the debtor's motion to dismiss the trustee's objection. The court then took evidence on the disputed issues. At the conclusion of the hearing, the court requested that the parties file post-hearing memoranda. The trustee filed a brief (Document No. 112) on September 27, 2001. The debtor filed a brief (Document No. 116) on October 1, 2001.

After considering all of the testimony, particularly the demeanor and credibility of the witnesses, the exhibits admitted at trial, the pleadings and written arguments of the parties, including the authorities cited by the parties, the court determines that the trustee's objection to the debtor's claim for administrative expense should be sustained and the debtor's application for allowance of administrative claim should be denied.

### II.

The court finds the following facts by a preponderance of the evidence:

### A. The Debtor's Bankruptcy Case.

The debtor filed a petition under Chapter 7 of the Bankruptcy Code on March 27, 1998. The debtor was *pro se*. In her schedules, the debtor listed unsecured non-priority debt in the amount of $38,657 (Document No. 2). The trustee conducted a meeting of creditors, pursuant to Section 341 of the Bankruptcy Code, on April 21, 1998. At the conclusion of that meeting, the trustee determined that there were no assets in the bankruptcy estate that could be administered for the benefit of creditors

(Document No. 10). The trustee duly filed a report of no distribution (Document No. 11). On July 7, 1998, the debtor received a discharge of her debts (Document No. 14), and the clerk closed the case soon thereafter (Document No. 16).

### B. *Tibey Pfeiffer's Probate Estate.*

In the meantime, on May 4, 1998, the debtor's aunt, Tibey Pfeiffer, passed away. The debtor was a 15 percent residuary beneficiary under her will, as was her brother Stephen Lickman (the debtor and her brother are collectively referred to here as the "Lickmans"). The residuary of the probate estate consisted of shares of BP Amoco stock and shares in two illiquid limited partnerships (Debtor's Exhibit No. 15).

The debtor's cousin, Marcy Shain, was a 60 percent residuary beneficiary under the will and was also the executrix of the probate estate (Debtor's Exhibit No. 10). The Court of Common Pleas, Orphans Court Division, located in Philadelphia County, Pennsylvania, issued letters testamentary to Marcy Shain on July 13, 1998 (Debtor's Exhibit No. 10).

Conflict soon arose between the Lickmans and Marcy Shain with respect to the administration and distribution of the probate estate. The Lickmans took issue with Marcy Shain's actions both before Tibey Pfeiffer's death (while operating under a power of attorney) and as executrix of the probate estate. The Lickmans also asserted that the executrix was a non-resident of Pennsylvania and was therefore required to post a bond.

In December 1998, the Lickmans commenced litigation against the executrix in the Pennsylvania Orphan's Court probate case.[1] The Lickmans filed an emergency petition for injunctive relief and a petition for citation and injunctive relief seeking to enjoin the executrix from making any further distributions from the probate estate (Debtor's Exhibit No. 10). At about the same time, the Lickmans also filed a petition for discovery (Debtor's Exhibit No. 10).

On December 7, 1998, the Pennsylvania Orphan's Court issued a preliminary decree that enjoined the executrix from making further distributions pending the filing of a final accounting (Debtor's Exhibit No. 11). On December 23, 1998, the Pennsylvania Orphan's Court entered a second decree by stipulation of the parties (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 39, lines 6–12).

That decree dissolved the preliminary decree and enjoined the executrix from making distributions to any legatee pending the posting of a bond in the amount of $400,000 (Debtor's Exhibit No. 11). The second decree further provided that the executrix could continue to administer the probate estate and pay the expenses incurred in that administration. The second decree also imposed a deadline of April 30, 1999, by which the Lickmans were to file an appeal of the Orphan's Court Decree of the Register to Wills admitting to probate the estate of Tibey Pfeiffer. Finally, the second decree reserved the Lickmans' rights to appeal the inventory or file objections to any account filed by the executrix. The executrix posted a bond shortly thereafter (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 64, lines 17–25).

The Lickmans did not file an appeal of the decree admitting the will to probate

---

1. The court notes that the evidentiary record made on August 10, 2001, does not contain a comprehensive or complete account of the Pennsylvania Orphan's Court proceedings. Of necessity therefore, the court's findings here are somewhat sketchy.

within the time set by the court. On April 29, 1999, the Pennsylvania Orphan's Court issued a decree that granted the Lickmans' petition for discovery (Debtor's Exhibit No. 11). To date, no demand has been made against the bond (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 80, lines 11–14).

## C. *The Debtor's Reopened Bankruptcy Case.*

Section 541(a)(5)(A) of the Bankruptcy Code provides that property of the estate includes any inheritance or bequest to which the debtor becomes entitled within 180 days of the filing of the petition. Notwithstanding this provision, the debtor did not disclose to the Chapter 7 trustee or the bankruptcy court her interest in the estate of Tibey Pfeiffer. The debtor instead informed her attorneys. At the hearing, the debtor testified that the "attorneys felt that it was not yet time to inform the trustee because [they and she] didn't think there was anything coming out of the probate estate; therefore, there would be nothing for the bankruptcy" (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 32, lines 14–19).

On August 10, 1999, counsel for the executrix, David Segal, contacted the trustee and informed her of the debtor's inheritance. The trustee promptly filed a motion to reopen the debtor's bankruptcy case to administer the asset (Document No. 17). The court entered an order reopening the case on August 16, 1999 (Document No. 18).

On the same date, Gerald J. D'Ambrosio, an attorney now acting on behalf of the debtor, wrote a letter to the trustee urging the trustee to abandon the estate's interest in the probate estate. He stated his opinion that the debtor's residuary share in the estate of Tibey Pfeiffer was essentially without much realizable value, especially when subtracted from the amounts already expended by the debtor in her litigation efforts in the Pennsylvania probate case (Debtor's Exhibit No. 16).[2] Mr. D'Ambrosio offered to exchange the illiquid limited partnership interests for repayment of $16,000 that he said the debtor had expended in attorney's fees in connection with the Pennsylvania probate case.[3] Although the letter was silent on the issue of the contentious and active probate litigation, the debtor testified that she informed the trustee "many times" of the executrix' alleged improprieties and court orders entered in the probate case (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 38, lines 21–25, and at page 39, lines 1–5).

On September 9, 1999, the court approved the employment of Lynnea Concannon as attorney for the trustee (Document No. 22). The trustee's counsel then

---

**2.** Mr. D'Ambrósio first entered an appearance as debtor's counsel in this bankruptcy case on August 30, 1999 (Document No. 20). He was not then a member of the Bar of the U.S. District Court for the Middle District of Florida as required by L.B.R.2090–1(a). The court entered an order directing compliance with L.B.R.2090–1 and striking the notice of appearance (Document No. 21). Gary L. Armstrong then entered an appearance as debtor's counsel on October 14, 2001 (Document No. 35). On December 14, 1999, Mr. Armstrong withdrew, and Mr. D'Ambrosio, by then ad-

mitted to our Bar, was substituted as debtor's counsel (Document No. 47).

**3.** Apparently, the debtor's offer excluded the BP Amoco stock. The trustee took the position that the entirety of the debtor's interest in the probate estate, including the stock, the limited partnerships, and any claims against the executrix, was property of the bankruptcy estate and did not seriously entertain this offer.

entered into preliminary negotiations with the executrix' counsel for the sale of the estate's interest in the probate estate (Debtor's Exhibit No. 4). The debtor, on her own, through her attorneys, Mr. D'Ambrosio and Mr. Armstrong, and through a friend, Robert Daniels or Robert Dizak, apparently made several phone calls to the trustee or trustee's counsel asserting her right to prosecute the claims against the executrix raised in the probate case in Pennsylvania independently of the bankruptcy court and the Chapter 7 trustee. On September 29, 1999, trustee's counsel wrote a letter to the debtor (Debtor's Exhibit No. 5) warning her that, "if [she] continue[d] to frustrate the efforts of the trustee to administer [the] bankruptcy case," the trustee would seek to revoke the debtor's discharge.

The trustee soon thereafter filed an adversary proceeding seeking to revoke the debtor's discharge pursuant to Section 727(d)(2) of the Bankruptcy Code (Adversary Proceeding No. 99–282). The complaint alleged the debtor's failure to disclose her interest in the Tibey Pfeiffer probate estate. After a trial, the bankruptcy court entered judgment in favor of the debtor (Adv.Proc.Doc. No. 33), finding that the debtor's failure to disclose her inheritance did not rise to the level of conscious fraud required to revoke her discharge pursuant to Section 727(d)(2) because the debtor had relied on the advice of counsel in not disclosing her inheritance. (Adv.Proc.Doc. No. 34).

The trustee also filed an adversary proceeding against the debtor seeking a declaratory judgment that the debtor's interest in the Tibey Pfeiffer probate estate, including all claims arising out of the executrix' actions in that estate, were property of the estate (Adversary Proceeding No. 99–227). The debtor vigorously opposed the trustee in that proceeding. The court ultimately determined that proceeding in the trustee's favor on summary judgment and held that the debtor's rights in the probate estate, including all tangible assets as well as any causes of action arising out of the probate estate, were property of the estate. (Adv.Proc.Doc. No. 29). The debtor took no appeal from this judgment.

The trustee then negotiated a sale of the estate's interest in the probate estate, including all causes of action against the executrix, to Marcy Shain individually for the sum of $23,500. In the notice of sale (Document No. 55, Debtor's Exhibit No. 15), the trustee stated that the sale price was "the approximate value of the BP Amoco Stock." The trustee further represented that "the claims against Marcy Shain are valueless to the bankruptcy estate." (Document No. 55, Debtor's Exhibit No. 15). Finally, the trustee represented that she believed the sale to be in the best interests of the estate because:

> ... any higher sale price is unlikely. The potential claims against Marcy Shain Messa would require very extensive discovery and substantial litigation expenses in order to determine the value and merit of said claims. The probate estate would continue to expend the estate assets defending such causes of action with the likely result that the estate would be exhausted. In addition, Paula Lickman has caused the bankruptcy estate to incur substantial expense defending and responding to frivolous claims and accusations. The limited partnership interests do not have sufficient value to justify further expense and risk of delay in liquidation of this asset.

After a hearing, the court found the sale to be in the best interests of creditors and approved the sale (Document No. 71) over the debtor's vehement objection. The debtor appealed this order to the district

court and to the court of appeals. Her appeals were dismissed.

### III.

The debtor asserts an administrative expense claim in the amount of $17,000, pursuant to Section 503 of the Bankruptcy Code, for "legal expenses and disbursements . . . ." The debtor contends that she expended "approximately $16,000 in legal fees and $1,000 in disbursements . . . to retain and pay Pennsylvania counsel to initiate proceedings in the Philadelphia Orphan's Court to obtain injunctive relief from unauthorized withdrawals of funds from the estate of Tibey Pfeiffer as well as other proceedings which were necessary to preserve the assets of the decedent's Estate." (Document No. 52).

The trustee objects to the administrative expense claim because the expenses sought by the debtor were incurred "while [the debtor] was attempting to avoid turnover of undisclosed property to the bankruptcy estate." The trustee further objects on the basis that the services and costs for which the debtor seeks an administrative expense provided no benefit to the bankruptcy estate.

■ Administrative expense claims allowed pursuant to Section 503 are accorded first priority status in a bankruptcy case and are paid directly from the bankruptcy estate before other claims, including claims of unsecured creditors. 11 U.S.C. § 507(a)(1). As a consequence, the allowance of an administrative expense claim reduces the funds available for other administrative claimants and creditors. *In re Alumni Hotel Corp.*, 203 B.R. 624, 630 (Bankr.E.D.Mich.1996). The court is therefore required to construe strictly and narrowly "the Bankruptcy Code provisions governing requests for priority payment of administrative expenses." *Woburn Associates v. Kahn (In re Hemingway Trans-*

*port, Inc.)*, 954 F.2d 1, 5 (1st Cir.1992). *See also, In re Patient Education Media, Inc.*, 221 B.R. 97, 101 (Bankr.S.D.N.Y. 1998) ["Because the priority elevates the payment of the administrative claim to the detriment of the unsecured creditors, the language of section 503(b)(1)(A) must be narrowly construed to promote the bankruptcy goal of equality of distribution."].

■ The administrative claimant carries the burden of persuasion. *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir.1999); *Hemingway Transport*, 954 F.2d at 5. The burden of persuasion is heavier when the claimant is the debtor who has been discharged of debts of the same creditors that will necessarily receive a diminished pro rata distribution if the administrative expense claim is allowed. *See, e.g., In re Brown*, 82 B.R. 869, 870 (Bankr.S.D.Ohio 1987).

### A. *The macro view of this dispute.*

■ When the debtor subjects herself to the jurisdiction of the bankruptcy court, the fresh start she enjoys comes with a concomitant obligation to cooperate in the administration of the estate. *In re Neese*, 137 B.R. 797, 800 (Bankr.C.D.Cal.1992) [debtor's services pledged to the estate by the act of filing bankruptcy]. This significant principle is illustrated by *Chappel v. Proctor (In re Chappel)*, 189 B.R. 489, 494 (9th Cir. BAP 1995), a case that is very close on its facts to this case. In *Chappel*, the debtor sought to exclude an inheritance from the estate. The appellate court affirmed the lower court's determination that the inheritance was property of the estate and in doing so touched upon the debtor's administrative expense claim. The court noted that the bankruptcy court had rejected the debtor's claim for administrative expense for monies spent on legal

fees, incurred in litigating in the probate court disputes between the debtor and another beneficiary, because the debtor "had a duty to preserve the probate estate interest."

To the extent that the debtor incurred fees and costs to preserve the probate estate asset for the benefit of the estate, therefore, she did so simply in the performance of her obligations under the Bankruptcy Code and as such those fees and costs do not qualify as an administrative expense.

Moreover, the statutory framework of the Bankruptcy Code makes clear that responsibility for administering the bankruptcy estate resides solely in the trustee. 11 U.S.C. § 323. In this case, the debtor deliberately failed to disclose a significant asset of the estate, however mistakenly, and usurped for herself the administration of that asset, precluding the trustee from performing her responsibilities to the estate.

The debtor contends that her actions should be construed similarly to a trustee's because ultimately they inured to the benefit of the bankruptcy estate. The debtor's motivation, however, was her own self-interest even when that self-interest impaired the recovery of an estate asset that would accrue to the benefit of the bankruptcy estate and its creditors. The debtor expended monies for legal services in the probate case in the clear expectation that doing so would maximize her inheritance. Yet the debtor took an inconsistent position when the trustee reopened the bankruptcy case, asserting that the asset had no realizable value to the bankruptcy estate and should be abandoned.

When it became apparent that the trustee was going to administer the asset, the debtor then sought to retain what she perceived to be the most valuable part of her inheritance, the cause of action against the executrix, while "giving up" the illiquid partnership stock in return for reimbursement of her legal expenses. This proposal, if accepted, would have resulted in a significant benefit to the debtor and a substantial detriment to the administrative claimants and creditors of the bankruptcy estate.

The trustee rejected the debtor's proposal. The debtor thereafter actively opposed the trustee's every action taken in furtherance of administering the asset for the benefit of creditors. As a consequence, the trustee was required to litigate with the debtor in the bankruptcy court to establish the trustee's clearly superior rights—at great expense to the estate. Thus, the debtor has unnecessarily caused the estate's legitimate administrative expenses to increase exponentially.

The allowance of an administrative expense in these circumstances would encourage conduct that is antithetical to the statutory framework by which a bankruptcy case is to be administered. The debtor did in the probate case that which she was not entitled to do and now seeks to impose the economic consequences of her *ultra vires* acts upon the very persons whose rights she deprived by her actions.

While keeping in mind the macro view of this dispute, the court can now turn to the specific statutory provisions upon which the debtor relies.

B. *Section 503(b)(2).*

■ The debtor first makes a claim for the allowance of these expenses pursuant to Section 503(b)(2) of the Bankruptcy Code. The debtor contends that she stands in the shoes of her attorney, who would otherwise be entitled to assert an administrative expense claim pursuant to Section 503(b)(2). In other words, the debtor argues that she is simply a conduit of pay-

ment for the attorney who rendered actual and necessary services on behalf of the bankruptcy estate.

Section 503(b)(2) provides for the allowance of an administrative expense claim, after notice and hearing, for "compensation and reimbursement awarded under section 330(a)" of the Bankruptcy Code. Section 330(a)(1)(A) and (B) allow to a professional person employed under Section 327 "reasonable compensation for actual, necessary services rendered by the ... professional person, or attorney ..." and "reimbursement for actual, necessary expenses." Section 327 provides that the trustee, with the court's approval, may employ a professional to represent or assist her in carrying out her duties.

Under this statutory scheme, a professional approved to assist the trustee under Section 327 may receive compensation and reimbursement of expenses determined by the court under Section 330 which are afforded administrative expense status under Section 503(b)(2). The key to Section 503(b)(2), therefore, is the court's approval of the professional's employment *by the trustee* under Section 327.

A plain reading of these statutes compels the court to conclude that the debtor can make no claim for administrative expense pursuant Section 503(b)(2). The debtor is not a trustee, examiner, or professional employed by the trustee within the meaning of Section 330(a) and can, therefore, make no direct claim for administrative expense. The attorney employed by the debtor is similarly not a professional employed by the trustee. Thus, Section 330 "precludes an award of ... attorney's fees from the Chapter 7 bankruptcy estate." *Inglesby, Falligant, Horne, Courington & Nash, P.C., v. Moore (In re*

*American Steel Product, Inc.),* 197 F.3d 1354, 1357 (11th Cir.1999).

Moreover, the court can find no authority in the statute or the case law to support the debtor's conduit theory as it relates to Section 503(b)(2). The cases that the debtor relies upon, *Alumni Hotel,* 203 B.R. at 633, and *In re Condere Corp.,* 251 B.R. 693, 695 (Bankr.S.D.Miss.2000), are cases in which a creditor sought the allowance of an administrative expense under a different provision of Section 503 and are inapplicable to Section 503(b)(2). In both cases, the claimants made their administrative claims pursuant to Section 503(b)(4). Section 503(b)(4), of course, specifically permits a creditor to seek reimbursement for the monies the creditor has paid for the professional services of an attorney or accountant under certain circumstances.

Section 503(b)(4) is not applicable on these facts because the debtor is not a creditor of the estate as that term is defined by the Bankruptcy Code. Section 101(10)(A) defines a creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief." In this case, however, the debtor's claim is for services that were provided *post*-petition. Section 101(10)(B) provides some additional ways in which an entity who is not a prepetition creditor may achieve creditor status. None of these triggering events or circumstances, however, is present in this case.[4] Section 503(b)(4) is therefore inapplicable. Apparently recognizing that Section 503(b)(4) provides her no assistance, the debtor does not rely on this section.

On the other hand, there is case authority that supports the trustee's contention

---

4. An entity may qualify as a creditor for postpetition obligations pursuant to Section 101(10)(B) if it has "a claim against the estate of a kind specified in section 348(b), 502(f), 502(g), 502(h), or 502(i) of this title."

that the debtor cannot make an administrative expense claim for her own attorney's fees pursuant to Section 503(b)(2). In *Brown,* 82 B.R. at 871, the court held that a debtor could not "step into the shoes of their attorney and assert a claim for [attorney's] fees as an administrative expense" pursuant to Sections 330(a) and 503(b)(2) of the Bankruptcy Code. The court noted that "[i]t is not only the nature of the claim which is given priority, but the statute [also] specifies the person to whom the claim is payable." The court further reasoned that the "allowance of attorney's fees pursuant to Section 503(b)(2) presume[s] its ability to approve the requested fees prior to their payment." That ability is lost when the debtor pays the attorney and then seeks reimbursement from the estate.

For the reasons stated in *Brown,* the court concludes that the debtor has failed to establish entitlement to an administrative claim under Section 503(b)(2) of the Bankruptcy Code.

### C. *Section 503(b)(1)(A).*

■ The debtor alternatively relies upon Section 503(b)(1)(A) for the allowance of her administrative expense claim. Section 503(b)(1)(A) provides for an administrative expense claim, after notice and hearing, for "the actual, necessary costs and expenses of preserving the estate . . . ." Unlike Sections 503(b)(2), (3) and (4), this provision contains no enumerated limitations as to the kind of applicant who can make a claim.

1. *Can the debtor make a derivative claim for attorney's fees and costs under Section 503(b)(1)(A) where the court has not previously approved the attorney's employment?*

At least one court has concluded that a party may not make a claim for attorney's

fees paid to an attorney whose employment has not been previously approved by the court pursuant to Section 327 of the Bankruptcy Code. In *In re Marlin Oil Co.,* 83 B.R. 50, 52 (Bankr.D.Colo.1988), the court refused to allow the debtor's administrative expense claim for its payment of attorney's fees under Section 503(b)(1)(A). In its reasoning, the court pointed out that:

The Bankruptcy Code contains numerous and detailed provisions concerning the employment of professional persons and their compensation and payment: See 11 U.S.C. §§ 327, 328, 330 and 503(b)(2). In light of these provisions, Congress cannot have intended that a professional person could sidestep the specific requirements set forth and come in later and claim payment under the general provision of § 503(b)(1)(A) as an actual necessary cost of preserving the estate. Nor was it contemplated that professionals such as attorneys, could enter into executory contracts pre-petition and have the Debtor assume such a contract and thus avoid the scrutiny of the Court and the other creditors under the Code provisions cited, supra.

Although *Marlin Oil* makes an excellent point, in *Brown,* 82 B.R. at 871, the court did not rule out the possibility that in exceptional circumstances the totality of the circumstances and the benefit to the estate might outweigh the considerations and concerns articulated in *Marlin Oil.* The court cautioned, however, that "the burden upon the claimant would be heavy in a Chapter 7 bankruptcy case." *Id.* The court found that the debtor had failed to meet that burden on the facts of that case. *Id.*

On the other hand, in *Scott v. Mechem Financial, Inc. (In re Mechem Financial,*

*Inc.)*, 152 B.R. 57, 60–61 (Bankr.W.D.Pa. 1993), the court found that the debtor's shareholder's efforts in obtaining and providing information to the trustee justified the allowance of an administrative expense for his attorney's fees and costs.[5]

For the reasons enumerated in Section III.A. above, the court concludes that no such exceptional circumstances are present here. To the contrary, the debtor's actions hindered the trustee's administration of the estate and substantially increased her costs of administration. The court will therefore adopt the reasoning explicated in *Marlin Oil* and *Brown.* Accordingly, the court determines that the debtor is not entitled to an administrative claim pursuant to Section 503(b)(1)(A) for her attorney's fees and costs where the court has not previously approved the employment of the attorney.

### 2. *The requisite elements of Section 503(b)(1)(A).*

■ Alternatively, the court determines that the debtor has failed to establish the requisite elements of Section 503(b)(1)(A). A party making a claim pursuant to Section 503(b)(1)(A) must establish that the expenses are (1) actual and necessary and (2) have benefited the estate in some tangible way. 3 L. King, *Collier on Bankruptcy,* ¶ 503.06[3] (15th ed. rev.2001).

### a. *Actual and necessary.*

■ Under the statute, the court is required to "scrutinize claimed expenses for waste and duplication to ensure that the expenses are indeed actual and necessary." *Condere,* 251 B.R. at 695. Here the debtor makes a claim for $17,000, comprised of $16,000 in attorney's fees and $1,000 in expenses.

The debtor testified that her administrative claim represents amounts she personally paid in connection with the Pennsylvania probate case (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 30, lines 16–22). The debtor's testimony was general—not specifically identified with particular services or costs—and did not withstand cross-examination. In addition, the debtor's own documentary exhibits do not support the debtor's testimony as to the total amount she paid in attorney's fees and costs in the probate case. The court, therefore, does not credit the debtor's testimony as to the expenses she claims.

In addition, the documentary exhibits do not provide the detail and precision that is required by Section 503(b) for the allowance of an administrative expense. Although it is apparent that the debtor and her brother did pay some money in their efforts in the probate case, the evidence does not permit the court to determine with any confidence the exact amounts or purposes of those expenditures.

At the hearing, the court admitted into evidence the debtor's summary of expenditures (Debtor's Exhibit No. 8) and copies of invoices, checks, and receipts (Debtor's Exhibit Nos. 8a, 8b, 8c, and 12 and Trustee's Exhibit No. 3) in support of the debtor's claim. The debtor's summary of expenditures (Debtor's Exhibit No. 8) shows a total expenditure amount of $22,077.27, which exceeds the debtor's requested administrative claim by $5,077.27, $3,221 of which is attributed to attorney's fees and $1,856.21 of which is attributed to costs. The debtor testified that this surplus corresponds to fees and costs paid by Stephen Lickman in connection with the Pennsylva-

---

5. The court focused exclusively on the claimant's unique role in the case and his substantial contribution to the administration of the estate. The court did not address the issues raised in *Marlin Oil* or discuss the actual and necessary element of Section 503(b)(1)(A).

nia probate case (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 28, lines 4–10). The checks and receipts admitted into evidence show payments of $15,250 in attorney's fees and $113 in costs.[6] The debtor contends that the documentary evidence supports her request for $16,000 in attorney's fees and $1,000 in costs.

The evidence unequivocally establishes, however, that Stephen Lickman's payments in the Pennsylvania probate case were substantially equal to the debtor's, not the substantially smaller amount described in the debtor's testimony. Ignoring for the moment the probative weight of the evidence, the evidence reflects that the debtor paid $5,875 in attorney's fees and $57 in costs (Debtor's Exhibit Nos. 81, 8c, and 12), Stephen Lickman paid $5,875 in attorney's fees and $56 in costs (Debtor's Exhibit Nos. 8a, 8b, 8c, and 12), and a third party, Robert Dizak, paid an initial $3,500 retainer on the debtors' behalf (Trustee's Exhibit No. 3, Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 27, lines 20–22).[7]

The court also notes that the probative weight of the checks attributed to the debtor's direct payments of $5,875 in attor-

ney's fees is considerably diminished by the absence of any actual evidence that the checks were ever negotiated. In addition, the lawyers' invoices in the record do not reflect any credit for these alleged payments (Debtor's Exhibit No. 12), suggesting that the payments were never made.[8]

The invoices, on the other hand, do corroborate Robert Dizak's payment of a $3,500 retainer. The debtor testified that Robert Dizak paid the retainer on her behalf as a loan (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page 27, lines 20–22). There is no evidence in the record, however, as to whether or not the debtor repaid any of the monies to Robert Dizak. The debtor cannot therefore establish that *she* actually made this payment.

In addition, the debtor offered no evidentiary support, other than general testimony that the court does not credit, for $750 in attorney's fees, $114 in filing costs, and all of the costs attributed to expenses for law books, photocopies of discovery material, travel, computer, postage, and telephone [9] as scheduled in the debtor's summary of expenditures (Debtor's Exhibit No. 8).[10] The debtor cannot therefore establish these fees and costs.

---

**6.** Debtor's Exhibit No. 12 contains copies of the front portion of six checks—three are drawn on Nationsbank and are made by the debtor, two are drawn on Wells Fargo Bank and are made by Stephen Lickman, and one is a carbon copy of a bank draft drawn on Wells Fargo Bank. Trustee's Exhibit No. 3 is a copy of the front portion of a check drawn on Marine Midland Bank and made by Robert Dizak.

**7.** Although the Wells Fargo bank draft copy does not contain a signature or otherwise reveal who purchased the draft, the court attributes the payment to Stephen Lickman because all of the other checks in evidence that were drawn on that bank were made by Stephen Lickman rather than the debtor.

Also, the evidence demonstrates a clear pattern of the debtor and Stephen Lickman making payments in identical amounts at identical times and attributing the $2,000 Wells Fargo bank check to Stephen Lickman is consistent with this pattern.

**8.** The record contains only invoices for services provided during the months of December 1998, January 1999, and April 1999.

**9.** These costs are apparently costs the debtor claims to have paid, not costs incurred by the attorneys representing the Lickmans.

**10.** The court calculates these amounts based upon the debtor's claim for $16,000 in attorney's fees and $1,000 in costs.

Accordingly, the debtor has established at most actual expenses of $5,875 in attorney's fees and $57 in costs.

In addition to establishing that the amounts claimed as administrative expenses were actually expended, the debtor must also demonstrate that the expenses claimed were necessary for the preservation of the bankruptcy estate. For example, in *In re Washington–St. Tammany Electric Cooperative, Inc.*, 111 B.R. 555, 560 (Bankr.E.D.La.1989), the court concluded that electricity that was actually delivered and used was necessary to the debtor's continued operations. Similarly, in *Condere*, 251 B.R. at 695, the court concluded that a creditor's "efforts to locate a viable purchaser for the debtor" were necessary to the preservation and/or enhancement of the assets of the estate.

To support her contention that her efforts were necessary for the preservation of the estate, the debtor testified that she engaged counsel in the Pennsylvania probate case to establish a bond, prevent the executrix from taking money out of the probate estate, and to determine whether and to what extent the executrix dissipated monies belonging to Tibey Pfeiffer before and after her death (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at pages 20, 25, and 26). The debtor further testified that the executrix was a non-resident of Pennsylvania and thus required to post a bond as a matter of state law (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at page) and because the executrix was improperly administering the probate assets.

The evidence before the court corroborates the debtor's testimony as to the fact that she and her brother initiated action in the probate court and the nature of the allegations made in that action. The evidence also shows that a bond was posted. There is no evidence in the record, however, as to the merits of the debtor's position in the Pennsylvania probate case other than the debtor's self-serving testimony that the court does not credit.

For example, there is no objective evidence in the record that supports the debtor's contentions as to the executrix' improprieties and malfeasance. The debtor herself testified that the Orphan's Court has not yet determined these claims against the executrix (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at pages 20, 25, and 26).[11] Similarly, there is no objective evidence in the record that the executrix is a non-resident of Pennsylvania and thus statutorily required to post a bond. The court entered the decree imposing the bond by stipulation of the parties (Document No. 110, transcript of final evidentiary hearing held on August 10, 2001, at pages 64, lines 17–25), and did not make any findings as to the necessity of the bond. There has been no claim made against the bond.

The court cannot find, therefore, that the debtor's efforts in probate court (including the filing of claims against the executrix, requests for discovery, or the securing of a bond) were necessary to recover monies for the benefit of the bankruptcy estate or to prevent the dissipation of the bankruptcy estate asset. The court also cannot find that the debtor's efforts in state court secured a bond required by Pennsylvania law. All the court can determine is that the executrix in fact posted a bond by stipulation after the Lickmans began their litigation in the probate court.

11. The debtor's claims against the executrix were sold by the trustee to Marcy Shain. The only existing claims at this time are those of Stephen Lickman.

On this record, therefore, it does not appear that the debtor has established that her actions taken in the Pennsylvania probate case were necessary for the preservation of the assets of the estate.

### b. *Tangible Benefit.*

■■■■ Under Section 503(b)(1)(A), the debtor must also establish that the services provided a tangible benefit to the bankruptcy estate. The issue of whether an administrative claimant has benefited the bankruptcy estate is a "question of fact for the court to determine." *Alumni Hotel,* 203 B.R. at 630. "Each case is judged subjectively." *Broadcast Corp. of Georgia v. Broadfoot (In re Subscription Television of Greater Atlanta),* 789 F.2d 1530, 1532 (11th Cir.1986). *But see Patient Education Media,* 221 B.R. at 102 ["The 'benefit' test is an objective one."].

■■■■ Regardless of whether a subjective or objective standard is used, the debtor must demonstrate "an actual, concrete benefit to the estate before a claim is allowable ... as an administrative expense." *Subscription Television of Greater Atlanta,* 789 F.2d at 1532, *quoting Broadcast Corp. of Georgia v. Broadfoot (In re Subscription Television of Greater Atlanta),* 54 B.R. 606, 613 (N.D.Ga.1985) (Internal quotations omitted). An administrative claim for services or costs for which the benefit is speculative or not fully realized, therefore, is not be entitled to administrative expense, even should the services ultimately result in a substantial and concrete benefit in the future. *Id.*

Other than securing the bond to satisfy a statutory requirement, this is exactly the category into which the debtor's administrative claim falls. The Lickmans' claims against the executrix were speculative at the time the debtor incurred the fees and costs. The trustee then sold the asset and terminated the estate's claims against the executrix. The trustee made no claim against the bond.[12]

Indeed, the trustee represented in her notice of sale of those claims that, even if the debtor's claims were meritorious, the expense in investigating and prosecuting those claims in the Pennsylvania probate case would be prohibitive in view of the acrimonious and contentious posture of the litigants. The benefit, if any, resulting from the debtor's actions in obtaining discovery, initiating action against the executrix for her alleged malfeasance, and securing the bond against further malfeasance, therefore, is too speculative to establish a tangible concrete benefit as required by Section 503(b)(1)(A).

The debtor's efforts in securing a bond to satisfy a statutory requirement implicate slightly different considerations. The court determined in Section III.C.2.a. above that the debtor had failed to establish that the bond was necessary to the preservation of the bankruptcy estate asset. Had the debtor established the necessity of the bond, however, there might have been some benefit to the bankruptcy estate from the debtor's efforts to secure that bond, regardless of whether the surety of the bond ever paid a claim on the bond.[13] The court need not reach this

---

**12.** If the other beneficiaries, including Stephen Lickman, pursue claims against the executrix in connection with the probate estate, the bond may benefit them.

**13.** For example, in *Alabama Surface Mining Commission v. N.P. Mining Co. (In re N.P. Mining Co.),* 963 F.2d 1449, 1458 (11th Cir.

1992), the court concluded that penalties imposed by the Alabama Surface Mining Commission were entitled to administrative expense status because they furthered a "policy of ensuring compliance by trustees with state law ...." Similarly, it would be reasonable to expect that services provided to secure a bond required by state law would benefit the bank-

issue, however, because the debtor failed to establish the necessity of the bond.

Even had the debtor established that the securing of the bond in the probate case was necessary in the probate case, the court would have been unable to determine the debtor's entitlement to an administrative claim because the invoices in evidence do not provide sufficient detail for the court to determine what expenses were associated with securing the posting of the bond. First, the invoices do not cover the entirety of the period for which the debtor seeks reimbursement. Second, the invoices contain a cursory summary of work performed that does not relate the services to the amounts charged. Third, the invoices do not contain any time records that show specifically the services and the time expended. Fourth, the total amount of attorney's fees incurred is clearly unreasonable in relation to the services provided—securing a bond required by statute. It would not take much in the way of attorney's fees to seek and secure compliance with such an obvious and simple statutory requirement.

▮ In addition, the court is required to determine the reasonableness of attorney's fees using factors enumerated by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). Those factors are: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the unde-

sirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.*

In *In re Finevest Foods, Inc.*, 159 B.R. 972, 981 (Bankr.M.D.Fla.1993), the court denied an application for administrative expense because there was insufficient evidence upon which to determine the reasonableness of the fees under these standards. Similarly, the record in this case contains insufficient evidence to determine the reasonableness of the amounts requested by the debtor using the factors enumerated in *Georgia Highway Express.*

For all of the reasons stated above, therefore, the debtor has failed to establish all of the elements required to justify the allowance of an administrative expense claim pursuant to Section 503(b)(1)(A).

### IV.

The debtor has failed to carry her heavy burden of persuasion with respect to her entitlement to an administrative expense claim for her legal expenses and costs incurred in connection with the Pennsylvania probate case. The debtor's claim for administrative expense falls short of every statutory requirement. The court concedes that the debtor's efforts may have benefited the estate to some degree. The trustee, however, had the obligation and the right to take action, as appropriate, to protect and administer the estate asset in the Pennsylvania probate court.

For the reasons stated above, the court will enter a separate final order:

1. denying the debtor's motion to dismiss the trustee's objection;

2. sustaining the trustee's objection to the debtor's application; and

---

ruptcy estate sufficiently to establish entitlement to the allowance of an administrative

expense in some amount for the reasons advanced in *N.P. Mining.*

3. denying the debtor's application for administrative expense claim.